[No. 7525-7-III.   Division Three.   August 13, 1987.]

GULAMMOHAMMED Z. REFAI, *Respondent,* v. CENTRAL
WASHINGTON UNIVERSITY, *Appellant.*

2

*Kenneth O. Eikenberry, Attorney General,* and *Thomas Chapman, Assistant,* for appellant.

*Michael Schwab* and *Schwab, Kurtz & Hurley,* for respondent.

MUNSON, J.—Central Washington University appeals the Superior Court's reversal of a decision by its Board of Trustees terminating Gulammohammed Z. Refai, Ph.D.,[1] a

---

[1] Dr. Refai received his B.A. and M.A. from Baroda University in India and his Ph.D. from Cambridge University in England. He is an acknowledged expert in Middle Eastern and South Asian history and is recognized by some as the world's leading authority on 17th century English imperialism in India.

tenured associate professor of history. We reverse the Superior Court.

In September 1981, the president of Central, pursuant to a delegation from the Board, declared a state of financial exigency. This was precipitated by a series of unanticipated financial setbacks, which culminated when the Legislature reduced Central's general fund budget by $3,584,000 later that fall. As a result, Central, through its Board, laid off 10 nontenured faculty members. In March 1982, the Legislature again reduced the general fund budget. In April, the Governor ordered further operating budget reductions. As a result of these actions, Central was forced to reduce its budget by an additional $853,000. In addition, the Board learned the budget reduction plan, which was adopted to cover the first budget reduction, fell approximately $50,000 short of its goal, and Central had an approximate $225,000 liability over the remainder of the biennium for its share of the utilities surcharge resulting from the demise of Washington Public Power Supply System plants 4 and 5.

On May 7, 1982 the president of Central wrote to all faculty, civil service, and administrative exempt personnel that the state of financial exigency had continued and become more serious. Pursuant to the provisions of the faculty code,[2] he asked the Faculty Senate Executive Committee (SEC) to evaluate his declaration of continued financial exigency and, if they agreed that cause for faculty layoffs existed, to prepare a layoff plan.

The SEC met on May 12 to evaluate the president's declaration of continued financial exigency. During the May 12 meeting, the president informed them $450,000 had to be cut from Central's instructional budgets. The SEC informed the president by letter dated May 14 they concurred with his declaration of continued financial exigency.

---

[2]The faculty code applicable to this case was adopted in 1981. It was proposed by the faculty after a series of meetings and adopted by the Board. The Board also delegated to the president the power to declare a state of financial exigency and to develop a layoff plan. It also provided an appeal procedure to anyone laid off. The procedures set forth in the code were followed here.

Between May 10 and June 10, the SEC met in closed session several times and developed a proposed layoff plan. The SEC developed the following criteria for determining which departments or programs would be selected for reduction: (1) the role of a department or program vis–a–vis the mission and roles of Central; (2) student needs as reflected by enrollment trends; (3) actual staffing versus positions generated by internal ratio and state formula; (4) academic need, *i.e.*, how many faculty members are needed to offer the necessary variety of courses for a given major or program; (5) potential for efficient reorganization of administrative structure; and (6) programmatic impact.

The SEC reviewed data for all the departments and programs and, based on the above criteria, compiled a list of departments and programs which they felt could sustain faculty layoffs. In the meantime, Central's augmented budget committee determined an additional $167,000 could be cut from various areas of Central's budget, reducing the targeted instruction budget reduction to $283,000. The chairman of the SEC listed 10 faculty positions which the SEC determined would have to be eliminated in order to accomplish the $283,000 reduction. These positions would be eliminated on the basis of seniority, *i.e.*, those with the least tenure would go. To lessen the negative impacts on programs and enrollment, the president reduced the proposed position cuts to seven. The difference was made up by utility savings, increased cuts to the physical plant budget, and almost the entire president's reserve budget used to cover unexpected emergencies.

The president met with the affirmative action director and informed her as to the departments or units that would be cut, but did not tell her the names of the people in those positions. The director reviewed the personnel records to see if the layoffs would adversely affect the affirmative action goals of Central and informed the president she had no objection to the proposed layoff plan. The SEC did not consult with the director during its deliberations.

On May 28, the president released the proposed layoff

plan to the academic community and invited "written responses" and "comments and suggestions" to be submitted to the Office of the Vice–President for Academic Affairs by noon on June 9. The SEC reviewed all the written responses. At a regular faculty senate meeting on June 2, the faculty discussed the proposed layoff plan. The faculty again discussed the plan in an open faculty forum attended by the president and the members of the SEC on June 8. Dr. Refai attended this meeting.

On June 10, the SEC met for the last time concerning the layoff plan. They invited the deans of the College of Letters, Arts and Sciences and School of Professional Studies and the department chairs of each of the affected departments to meet with them individually to discuss the proposed plan before it was sent to the president. The SEC modified its proposed plan by deleting the proposed elimination of the physics position, reasoning that it would be difficult to maintain a physics program without four faculty at a time when Central was moving to strengthen its efforts in technology. The president concurred in dropping the physics position from the layoff list without knowing how the difference would be made up. He learned that all but $1,500 of the difference could be made up from a payment on a defaulted contract; the rest could be made up by small contributions from the budgets of the Graduate Office, Undergraduate Office, and the Vice–President for Academic Affairs.

The SEC sent the final draft of the proposed layoff to the president on June 10. On June 17 the president sent notices to the affected faculty indicating that on the basis of seniority in their respective departments they would be laid off effective December 31, 1982[3] for reasons of financial exigency. Dr. Refai received one of the notices.

Dr. Refai requested a formal hearing in a letter dated

---

[3]This date was selected rather than June 1982 to allow the laid off faculty to seek other employment. The president believed the budget would permit this delay in severance or could be adjusted to accommodate it.

June 21, 1982. The hearings officer conducted hearings from December 28, 1982, through January 19, 1983, and determined that the closed meetings of the SEC violated RCW 42.30, the Open Public Meetings Act of 1971, and rendered the entire process void. The Board issued resolution 83-3 which adopted the hearings officer's findings of fact and conclusions of law and his proposal for decision, except the Board found no violation of RCW 42.30 and affirmed Dr. Refai's layoff. Dr. Refai petitioned for judicial review; the Superior Court reversed the decision of the Board and ordered Central to reinstate Dr. Refai with back pay effective January 1, 1983. Central appeals.

## STANDARD OF REVIEW

Our review is governed by the State Higher Education Administrative Procedure Act, RCW 28B.19, the provisions of which are identical to the Administrative Procedure Act, RCW 34.04. *Stastny v. Board of Trustees*, 32 Wn. App. 239, 245, 647 P.2d 496, *review denied*, 98 Wn.2d 1001 (1982), *cert. denied*, 460 U.S. 1071, 75 L. Ed. 2d 950, 103 S. Ct. 1528 (1983). The scope of our review is on the record of the administrative tribunal itself, not of the Superior Court. *Clark v. Horse Racing Comm'n*, 106 Wn.2d 84, 88, 720 P.2d 831 (1986); *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 323-25, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106, 74 L. Ed. 2d 954, 103 S. Ct. 730 (1983).

■■ RCW 28B.19.150(6) provides:

The court may affirm the decision appealed from, or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

. . .
(d) Affected by other error of law; or
(e) Clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
(f) Arbitrary or capricious.

We will not disturb the Board's findings of fact unless, after

reviewing the entire record, we have a definite and firm conviction a mistake has been committed. *Sherman v. Moloney*, 106 Wn.2d 873, 880, 725 P.2d 966 (1986); *Franklin Cy.*, at 324. We will substitute our judgment, however, for that of the Board's conclusions of law, although we will accord substantial weight to the Board's view of the law. *Clark*, at 88.

### FINANCIAL EXIGENCY

■ Central first contends the court erred in finding Central's actions in continuing to hire full-time and part-time faculty and its failure to relocate personnel[4] were inconsistent with a financial exigency justifying the termination of a tenured faculty member. In so finding, the court rejected the hearings officer and Board's finding a state of financial exigency did exist. Although the evidence in support of the Board's finding of a bona fide financial exigency is plentiful, we must also determine whether the state of financial exigency *caused* Dr. Refai's termination. *See American Ass'n of Univ. Professors v. Bloomfield College*, 136 N.J. Super. 442, 346 A.2d 615, 617 (1975). He contends the true reason for his termination was Central's desire to cut programs which were obsolete, nontechnological, and nonlucrative. He cites no evidence to support his claim other than the fact that during the state of financial exigency Central hired people to fill new positions in ballroom dance, leisure studies, and in the food services. However, the hiring of faculty is not necessarily inconsistent with a bona fide financial exigency necessitating the layoff of tenured faculty in other departments. *See Keppeler v. Board of Trustees*, 38 Wn. App. 729, 733, 688 P.2d 512 (1984). We do not have a firm and definite conviction a mistake has been committed; thus, we must agree with the Board's finding the state of financial exigency did exist and was the true cause of Dr. Refai's termination. We note further that courts should exercise caution when reviewing this type of

---

[4]Dr. Refai claims he could have taught English or worked in the library.

decision.

> [W]here lack of funds necessitate[s] releasing a sizeable number of the faculty, certainly it [is] peculiarly within the province of the school administration to determine which teachers should be released, and which retained.
>
> Where there is a showing that the administrative body, in exercising its judgment, acts from honest convictions, based upon facts which it believes are for the best interest of the school, and there is no showing that the acts were arbitrary or generated by ill will, fraud, collusion or other such motives, it is not the province of a court to interfere and substitute its judgment for that of the administrative body.

*Klein v. Board of Higher Educ.*, 434 F. Supp. 1113, 1118 (S.D.N.Y. 1977) (quoting *Levitt v. Board of Trustees,* 376 F. Supp. 945, 950 (D. Neb. 1974)). *See also Goss v. Lopez,* 419 U.S. 565, 577–78, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975).

As two commentators have noted:

> Allowing courts or faculty members to second guess the response of university administration to a bona fide financial crisis would serve to protect neither the financial stability of the institution nor the academic freedom of the faculty. The summary question must be one of causation and motive; if the institution's decision to terminate a tenured faculty member was caused by financial exigency and the university has no other improper motive for the termination, then the question of whether the termination was the best response under the circumstances is a purely administrative one.

Bolger & Wilmoth, *Dismissal of Tenured Faculty Members for Reasons of Financial Exigency,* 65 Marq. L. Rev. 347, 355 n.35 (1982).

### COMPLIANCE WITH THE FACULTY CODE

We next address whether the layoff plan was formulated and implemented in compliance with the faculty code. Section 3.78A provides in part:

> If cause for the declaration is substantiated, this plan will (1) identify particular departments or programs in which a specified number of positions are to be eliminated, (2)

state the reasons for each decision as to department or program and number of positions, (3) describe the process by which such decisions were arrived at, and (4) establish a strict timetable for each step in the process of review and for final implementation of the plan.

The layoff plan stated the reasons for the layoffs in a very succinct fashion: "The above listed positions are recommended for elimination based on program need, enrollment trends and faculty positions generated, or curtailment of program." The Board adopted the hearings officer's finding the layoff plan was written in minimal compliance with the faculty code and that the reasons for the layoff were adequately set forth. The court determined the reasons were not adequately set forth and reversed the Board's decision. Again, we cannot say with definite and firm conviction the Board erred in making this finding; accordingly, we reverse on this issue. Dr. Refai contends on appeal the layoff plan did not adequately describe the process by which the layoff decisions were made because it did not refer to specific data or information. The layoff plan, however, listed six criteria, noted previously herein, the SEC considered in establishing the plan; thus, we find sufficient compliance with section 3.78A.

Dr. Refai also contends Central had an affirmative duty to find alternative employment within Central. However, section 3.78C requires Central to make an effort to find commensurate employment if the layoff is necessitated by staffing adjustments or program needs and not when it is caused by financial exigency. We decline to impose this requirement, as Dr. Refai urges, on Central. Moreover, the Board adopted the hearings officer's finding that Central did make adequate efforts to find alternative employment for Dr. Refai.

## AFFIRMATIVE ACTION

We next examine whether Central's layoff plan violated its affirmative action program. Shortly before the layoff was finalized, the president met with Central's affirmative action director to discuss whether the layoffs would

adversely affect the affirmative action goals of Central. The president told the director what positions would be cut, but did not tell her the specific people to be laid off. The director called the president the next day and told him she had no objection to the plan based strictly on seniority. Dr. Refai contends the failure of the SEC to consider the affirmative action plan during its preparation of the layoff plan is essentially a violation of the affirmative action plan and cites the following language from the first page of the plan: "The University administration acknowledges that an Affirmative Action Program, to be successful, must be built into the structures and procedures affecting all personnel actions and the administration of all programs, activities and services." Part III, section F, relating to layoffs, provides:

> Statistical summaries of employees laid off and/or reinstated will be submitted to the Affirmative Action Director on a quarterly basis for the purpose of developing and maintaining procedures for auditing Layoff and Return from Layoff to determine the impact on current policies and procedures on minorities, women, handicapped and Viet Nam era or disabled veterans.

This language suggests the plan does not require Central to consider it before the layoffs are made. There was, as Dr. Refai concedes, no evidence Central had a specific intent to discriminate. Therefore, the layoff plan, using a strict seniority system to determine who was to be terminated, did not violate Central's affirmative action plan nor Dr. Refai's civil rights. *See Firefighters Local 1784 v. Stotts*, 467 U.S. 561, 81 L. Ed. 2d 483, 104 S. Ct. 2576 (1984).

### THE OPEN PUBLIC MEETINGS ACT

We must next determine whether the SEC meetings violated RCW 42.30, the Open Public Meetings Act of 1971. RCW 42.30.030 provides: "All meetings of the *governing body* of a *public agency* shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise provided in this chapter." (Italics ours.)

The terms "governing body" and "public agency" are defined in former RCW 42.30.020, in effect at the time of the meetings in question, as follows:

(1)"Public agency" means:
(a) Any state board, commission, committee, department, educational institution, or other state agency which is created by or pursuant to statute, other than courts and the legislature;

. . .
(c) Any subagency of a public agency which is created by or pursuant to statute, ordinance, or other legislative act, including but not limited to planning commissions, library or park boards, commissions, and agencies;

. . .
(2) "Governing body" means the multimember board, commission, committee, council, or other policy or rule-making body of a public agency.

Laws of 1982, 1st Ex. Sess., ch. 43, § 10, p. 1307.

While Central does not dispute it is a public agency, it claims the SEC is not itself a public agency because it is not a "subagency of a public agency which is created by or pursuant to statute," nor is it a "governing body" of a public agency, Central. The hearings officer found the SEC to be a "governing body" of Central and thus subject to the Open Public Meetings Act of 1971. The Board, on the other hand, found the SEC was not created pursuant to statute and also was not delegated any policy or rulemaking authority and, therefore, was not subject to the act. The Superior Court found, in turn, the SEC to be a governing body of Central because its layoff plan was a necessary antecedent to Central's action.

Whether the SEC is subject to the Open Public Meetings Act of 1971 is a question of law; thus, we make this determination de novo although we afford substantial weight to the Board's decision. *Clark,* at 88. We begin by determining whether the SEC is a subagency of a public agency, *i.e.,* whether it was "created by or pursuant to statute, ordinance, or other legislative act". In *Cathcart v. Andersen,* 85 Wn.2d 102, 530 P.2d 313 (1975), the issue was whether the

Open Public Meetings Act of 1971 applied to the monthly meetings of the University of Washington Law School faculty. The court determined the law school was a subagency of a public agency, the University of Washington, because RCW 28B.20.020 and .060 specifically enabled the university to create a law school. *Cathcart,* at 105. The court, therefore, focused on whether the law school faculty was a "governing body" of the law school. *Cathcart,* at 105–06. Because there are no enabling provisions authorizing the creation of the SEC in the present case, the SEC is not a subagency of Central. Therefore, we focus on whether SEC is a "governing body" of Central.

To be a "governing body," the SEC must be a "policy or rule–making body" of Central. In *Cathcart* the court found the law school faculty to be a "policy or rule–making body" of the law school for several reasons. First, RCW 28B.20-.200 provided that the "faculty shall have charge of the immediate government of the institution". Second, the Board of Regents by resolution formulated certain de facto delegations to the faculty which gave them considerable power in governing the school. The faculty (1) unilaterally approved curriculum additions and deletions; (2) amended scholastic standards; (3) exercised its authority to provide adequate instruction and supervision of its students; and (4) took final action related to the sponsorship of guest speakers and other extracurricular uses of law school facilities. Third, the president of the university issued an executive order authorizing the university faculty to enact regulations for the immediate government of the university and to share responsibility with the president and the academic deans in such matters as:

1. educational policy and general welfare;
2. policy for regulation of student conduct and activities;
3. scholastic policy, including requirements for admission, graduation, and honors;
4. approval of candidates for degrees;
5. criteria for faculty tenure, appointment, and promotion;

6. recommendations concerning the University budget;

7. formulation of procedures to carry out the policies and regulations thus established.

*Cathcart,* at 107. The power of the law school faculty in *Cathcart* to govern the affairs of the law school was significantly broader than the power of the SEC, which had no governing power.

Here, section 3.78A of the faculty code provided that once the president declares a state of financial exigency he will direct the vice–president and the SEC to develop a layoff plan. After the vice–president and SEC evaluate the declaration of financial exigency and the cause or causes of the layoff, they are to develop a layoff plan, make it available for review and comment, and submit it with a recommendation to the president. "The president shall then decide whether to implement the plan as presented or to propose modifications to the vice president and the Senate Executive Committee."

■ We are aware of the legislative declaration as to the need for open meetings, RCW 42.30.010, and that the act is remedial and should be liberally construed, RCW 42.30.910. However, even under a very liberal construction, the SEC is not a "governing body" of Central. Dr. Refai urges that we adopt the reasoning of the hearings officer and the Superior Court that because the SEC's action in developing a layoff plan, while not binding on the president or Central, was a necessary antecedent to the president's and Central's action and therefore the Open Public Meetings Act of 1971 applied. We reject this reasoning because we are not persuaded the SEC's formulation of a layoff plan is a "policy or rulemaking" function; the SEC merely makes recommendations subject to the president's modifications. The final layoff decision is the president's, not the SEC's. Here, the president modified the SEC's recommendation. The SEC's authority is quite different from the broad authority exercised by the law school faculty in *Cathcart*. Therefore, the SEC is not a "governing body" of Central and, thus, not subject to the Open Public Meetings Act of 1971.

This finding is consistent with the purposes of the Open Public Meetings Act of 1971 in that it was not designed to cover groups which meet to collect information and make recommendations, but have no authority to make final decisions. *Compare McLarty v. Board of Regents,* 231 Ga. 22, 200 S.E.2d 117 (1973). Thus, we are not persuaded the public interest is advanced by requiring these types of meetings to be open to the public.[5] *See Pierce v. Lake Stevens Sch. Dist. 4,* 84 Wn.2d 772, 787, 529 P.2d 810 (1974).

## DUE PROCESS

As a tenured professor, Dr. Refai's interest in continued employment is a property right protected by the due process clause of the Fourteenth Amendment. *Washington Educ. Ass'n v. State,* 97 Wn.2d 899, 908, 652 P.2d 1347 (1982); *see also Board of Regents v. Roth,* 408 U.S. 564, 576–78, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); *Perry v. Sindermann,* 408 U.S. 593, 599–602, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972). The issue is "what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972).

█ Although the protean nature of due process requires that procedures vary according to the particular interests at stake, *Brock v. Roadway Express, Inc.,* ___ U.S. ___, 95 L. Ed. 2d 239, 107 S. Ct. 1740, 1747 (1987); *In re Deming,* 108 Wn.2d 82, 97, 736 P.2d 639 (1987), "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) (quoting *Armstrong v. Manzo,* 380 U.S.

---

[5]A stronger case can be made under the current definition of "governing body" in RCW 42.30.020(2) for the SEC to be subject to the Open Public Meetings Act of 1971:

(2) "Governing body" means the multimember board, commission, committee, council, or other policy or rule–making body of a public agency, or any committee thereof when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment.

However, the SEC meetings in question were held before July 24, 1983, the effective date of the statute.

545, 552, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965)). Initially, we observe that the Fourteenth Amendment does not require that Dr. Refai have the opportunity to respond prior to the decision to lay off specific individuals. *Johnson v. Board of Regents,* 377 F. Supp. 227, 239 (W.D. Wis. 1974), *aff'd,* 510 F.2d 975 (7th Cir. 1975). It must have been apparent to Dr. Refai, who attended the faculty meeting on June 9, that he was a candidate for the layoff plan. Therefore, we focus on what procedures were required after the layoff letters were sent. To determine the required procedural safeguards, we must weigh the following factors: (1) the private interest in retaining employment; (2) the risk of erroneous termination; and (3) the government interest, including the fiscal and administrative burdens that additional or substitute procedures would entail. *Mathews,* 424 U.S. at 335; *see also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985).

In *Loudermill,* the Board of Education dismissed Mr. Loudermill, a security guard, for dishonesty in filling out the job application. He was not afforded an opportunity to respond to the charge or challenge his dismissal. The Court first determined that, because he was a classified civil servant who could be terminated only for cause pursuant to an Ohio statute, he possessed a property right in continued employment and, therefore, was entitled to the protections of due process prior to termination. *Loudermill,* 470 U.S. at 538–41. The Court then utilized the *Mathews* balancing test:

> First, the significance of the private interest in retaining employment cannot be gainsaid. . . .
> Second, some opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision. Dismissals for cause will often involve factual disputes. . . .
>
> . . .
> The governmental interest in immediate termination does not outweigh these interests. As we shall explain, affording the employee an opportunity to respond prior to termination would impose neither a significant admin-

istrative burden nor intolerable delays. Furthermore, the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep a qualified employee on than to train a new one.

(Citations omitted.) *Loudermill,* 470 U.S. at 543–44.

The Court noted, at pages 545–46, that

the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.

The Court concluded that Mr. Loudermill was "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill,* 470 U.S. at 546.

■ *Loudermill,* however, has limited application to a case where an employee is terminated for reasons of financial exigency. *Jermain v. Board of Regents,* 23 Mass. App. Ct. 428, 503 N.E.2d 50 (1987); *Breslin v. School Comm.,* 20 Mass. App. Ct. 74, 478 N.E.2d 149 (1985). Because Dr. Refai's termination was not due to allegations of misconduct, the reasons for requiring a pretermination hearing are not as compelling. *Johnson,* 377 F. Supp. at 237; *see also Krotkoff v. Goucher College,* 585 F.2d 675, 680 (4th Cir. 1978); *Russell v. Harrison,* 562 F. Supp. 467, 469 (N.D. Miss. 1983), *rev'd in part,* 736 F.2d 283 (5th Cir. 1984). While we recognize the significant private interest Dr. Refai has in retaining his employment at Central, we do not believe the risk of erroneous termination is as serious as it is in cases such as *Loudermill* where an employee is discharged for some type of misconduct. Although a pretermination hearing serves the important purpose of providing an "initial check against mistaken decisions," it has limited use where the termination was caused by financial exigency. Also, the administrative burdens and delays resulting from a pretermination hearing for every terminated faculty

member are significant.

The president of Central sent Dr. Refai a layoff letter and a copy of the layoff plan. The letter described the budget reductions which were necessary to resolve the financial exigency and described the process by which the decision was made. The layoff plan included a list of the criteria used to select the positions for layoff. Dr. Refai received a copy of the pertinent faculty code sections and was informed of his right to appeal the decision. Dr. Refai has followed the appeal process set forth in the faculty code. On balance, we are not persuaded Dr. Refai's due process rights were violated.

In conclusion, we are not persuaded the Board's findings of fact and conclusions of law are clearly erroneous, arbitrary, or capricious, or affected by other legal error. The decision of the Superior Court is reversed; the decision of the Board is reinstated.

GREEN, J., concurs.

McINTURFF, C.J. (concurring in part, dissenting in part)—Although I concur with the majority's conclusion that a state of financial exigency existed and that there was no violation of Central's affirmative action program, I write separately because I would hold the Open Public Meetings Act of 1971 is applicable to meetings of the Faculty Senate Executive Committee (SEC) held to develop a layoff plan. Because I would affirm the Superior Court's reversal of the layoff decision of the Board of Trustees for violation of the Open Public Meetings Act of 1971, I do not address whether the due process clause of the Fourteenth Amendment requires a pretermination hearing in a layoff for financial exigency. However, under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985) and *Mathews v. Eldridge*, 424 U.S. 319, 335–36, 350, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) there is a persuasive argument that the property interest Dr. Refai had in retaining his tenured position is significant enough to

require constitutional protection of a pretermination hearing. There may be a lower risk of erroneous termination in a termination for financial exigency, as opposed to termination for cause, and the government interest in making prompt budget cuts to respond to the financial exigency may outweigh Dr. Refai's interest. However, I am not persuaded this is the case and believe the issue requires further analysis.

A 3–prong approach is useful in addressing the applicability of the Open Public Meetings Act of 1971 to the layoff plan developed by the SEC. First, are SEC meetings leading to a recommended layoff plan within the scope of the Open Public Meetings Act of 1971? Second, is the resulting layoff plan null and void because the SEC meetings were not open to the public? And, third, does Dr. Refai have standing to raise a violation of the Open Public Meetings Act of 1971?

> A. Are SEC meetings leading to a recommended layoff plan within the scope of the Open Public Meetings Act of 1971?

Although the majority has set out the applicable statutory provisions, I restate them because of the critical importance of the statutory language. RCW 42.30.030 provides:

> Meetings declared open and public. All meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the *governing body* of a *public agency,* except as otherwise provided in this chapter.

(Italics mine.) "Public agency" is defined by RCW 42.30-.020(1):

> (1) "Public agency" means:
> (a) Any state board, commission, committee, department, educational institution, or other state agency which is created by or pursuant to statute, other than courts and the legislature;
> . . .
> (c) Any *subagency of a public agency* which is *created*

*by or pursuant to statute,* ordinance, or other legislative act, including but not limited to planning commissions, library or park boards, commissions, and agencies;

(Italics mine.) "Governing body" is also a defined term under RCW 42.30.020(2). The wording of the definition before 1983 amendments was:

> (2) "Governing body" means the multimember board, commission, committee, council, or other *policy or rule–making body* of a public agency.

(Italics mine.) Laws of 1982, 1st Ex. Sess., ch. 43, § 10, p. 1307. RCW 42.30.020(2) now reads:

> (2) "Governing body" means the multimember board, commission, committee, council, or other policy or rule–making body of a public agency, or any committee thereof when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment.

Laws of 1983, ch. 155, § 1, p. 669.

As Dr. Refai contends, and the majority recognizes, RCW 42.30 has been declared to have the remedial purpose of guaranteeing public access to and participation in the activities of their representative agencies; therefore, the act should be liberally construed and its exceptions narrowly confined. *Mead Sch. Dist. 354 v. Mead Educ. Ass'n,* 85 Wn.2d 140, 145, 530 P.2d 302 (1975); *Port Townsend Pub'g Co. v. Brown,* 18 Wn. App. 80, 567 P.2d 664 (1977).

The majority stated, and I agree, the relevant question is whether the SEC meetings were meetings of the "governing body" per RCW 42.30.030, since only meetings of the governing body of a public agency or subagency are subject to the open meetings provisions. The definition of governing body in effect in 1982 when the layoff plan was prepared has two elements: (a) it must be multimember; (b) it must be a "policy or rule–making body". Although not binding on this court, AGO 33 (1971), at 9 interpreted the phrase "policy or rule–making" to modify the terms that precede it as well as those that follow so that only boards, commissions, etc., that are policy or rulemaking are covered by the

Open Public Meetings Act of 1971. Regarding advisory committees, etc., although the subagency's advice may not be binding on the agency to which it relates, *it "must . . . be legally a necessary antecedent to that agency's action*; . . ." for the subagency to be a policy or rulemaking body. (Italics mine.) AGO 33 (1971), at 9. This definition of governing body was also applied in AGO 1 (1983).

The majority's conclusion that the SEC is not a governing body under the Open Public Meetings Act of 1971 rests heavily on the factual distinction between the decisionmaking power conferred on the law school faculty in *Cathcart v. Andersen*, 85 Wn.2d 102, 530 P.2d 313 (1975) and the authority conferred on the SEC. The law school faculty in *Cathcart* exercised greater policy or rulemaking power than the SEC, but to distinguish *Cathcart* as the majority has, *i.e.*, by concluding the Open Public Meetings Act of 1971 is not applicable in this instance, ignores the policy expressed by *Cathcart*. Such interpretation conflicts with the legislative mandate instructing us to broadly construe coverage of the Open Public Meetings Act of 1971.

*Cathcart,* at 107, rejected the argument that the Open Public Meetings Act of 1971 should not apply because faculty action is always ultimately subject to the rulings of the Board of Regents and executive orders of the president and thus, the faculty was not truly a "governing body". In so doing *Cathcart,* at 107, stated:

> We believe that the purpose of the Act is to allow the public to view the decisionmaking process at all stages. The decisions of the faculty are "conditional" only in an abstract hypothetical sense and the board of regents adopts faculty actions almost as a matter of course. The legislature in the enacting section of the Act (RCW 42.30.010) states, in some of the strongest language we have seen in any legislation, that:
>
>> The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people

insist on remaining informed so that they may retain control over the instruments they have created.

In RCW 42.30.910, it is stated:

The purposes of this chapter are hereby declared remedial and shall be liberally construed.

Likewise the fact the SEC was charged with drafting a layoff plan for approval by the president does not take the SEC action out of the scope of the Open Public Meetings Act of 1971. Provisions of the faculty code convince me that the formulation of a draft layoff plan by the SEC was necessary to the president's decision to lay off Dr. Refai; that without a valid draft layoff plan, Dr. Refai's layoff would violate the faculty code. Therefore the SEC's action was the action of a policy or rulemaking body.

Section 0.01B of the Faculty Code of Personnel Policy and Procedure, September 1981, provides: "This code is binding on the faculty . . ., the university administration, and the Board of Trustees." Section 3.78 of the faculty code is entitled "Layoff Policy" and provides:

Layoff Policy

It is *necessary* for Central Washington University to maintain a layoff policy in order to make such adjustments in staffing as may be necessitated by financial exigency or program needs. . . . Under the provisions of this policy, all faculty members, regardless [of] rank, position, or tenure status, are subject to possible layoff in the event of financial exigency or program needs.

A. If such financial exigency or need for staffing adjustment among programs occurs, the president of the university *shall* declare to the faculty, in written form or in public assembly, the causes that exist for layoff; and *shall direct* the vice president for academic affairs and the Faculty Senate Executive Committee jointly *to develop a layoff plan* which will address the university's need to reduce the number of faculty members when employed or reallocate faculty positions among the units of the university. The academic vice president and the Senate Executive Committee will evaluate the declaration of financial exigency or need for staffing reallocation and the cause or causes

for layoff. If cause for the declaration is substantiated, this plan will (1) identify particular departments or programs in which a specified number of positions are to be eliminated, (2) state the reasons for each decision as to department or program and number of positions, (3) describe the process by which such decisions were arrived at, and (4) establish a strict timetable for each step in the process of review and for final implementation of the plan. The plan will then be made available for review by the Faculty Senate, the deans, and the departments or programs, all of whom may submit written responses to the academic vice president before a date to be specified on the timetable. The vice president and the Senate Executive Committee *shall* then formulate and submit to the president a draft of the proposed plan, modified to whatever extent they see fit in the light of written responses; this draft shall list the names of affected faculty members, as determined on the basis of order of seniority within a department or program, in accordance with the criteria of 3.78 G. below. *The president shall then decide whether to implement the plan as presented or to propose modifications to the vice president and the Senate Executive Committee.*

B. When the plan is in a final form satisfactory to the president, *the academic vice president and the Senate Executive Committee, the president or his designee shall implement it by* sending by certified mail, or causing to be personally delivered, a layoff notice to each affected faculty member. Each notice of layoff shall be signed by the president, shall include a copy of the final layoff plan; and shall inform the faculty member of the layoff date, of the right to appeal, and of the right to re–employment.

(Italics mine.)

Significantly, the faculty code terms the layoff plan as "necessary" and uses the wording "shall" when dictating the obligations of the SEC to develop a draft layoff plan. The president has the final decision on whether to implement the plan "or to propose modifications to the vice president and the Senate Executive Committee," however, the SEC and the president share responsibility for imple-

menting the layoff plan. Faculty Code § 3.78A, B.

The general policy of the Open Public Meetings Act of 1971 supports a requirement that the SEC formulate any draft layoff plan in open meetings. In an open meeting the public has the right to *hear* the deliberations of the university body having the task of deciding which programs to retain or cut, and, consequently, which positions to recommend for layoff. The decision favoring technological programs over liberal arts (including history) ultimately impacts the educational opportunities available to the public. Public input is more likely to impact the SEC's decision if it occurs while the programmatic deliberations are being made, when members of the public can request the opportunity to give testimony before the committee, write to the committee and inform the local and university papers. It is important to recognize that the Open Public Meetings Act of 1971 does not contemplate public disruption of the meeting, rather it mandates that the public has a right to know what is discussed in the meeting.

Here, the draft layoff plan was made public on May 28, 1982, and discussed at an open faculty forum on June 8, 1982. June 9, 1982, only 1 day later, was the deadline for written responses on the draft layoff plan. As a practical matter, this opportunity for public input was too brief to permit influence of the layoff decisions. Also, there was no opportunity for public input regarding modifications made to the plan after the deadline for written responses. If the content of the committee hearings was accessible to interested persons as the hearings progressed, there would be no surprises and ample opportunity to formulate objections in a constructive manner.

The university was asked why the SEC met in closed meetings to draft a proposed layoff plan. Vice–President Harrington said it would be bad for morale for the SEC to hold public meetings. He stated the 1973 open meetings concerning layoffs tore departments apart and embittered people as each department or member within a department tried to avoid cuts; that the university considered those

open meetings a mistake they would not make again. This testimony only reinforces the need for an open public meetings act. The policy statement of the Open Public Meetings Act of 1971 declares the public does "not give their public servants the right to decide what is good for the people to know and what is not good for them to know." RCW 42.30.010. The university may not make layoff plans in closed meetings, depriving the public of the right to know of the deliberations being conducted and which will have a significant impact in determining which educational programs will be cut. It is the public which will suffer if decision makers sacrifice history programs to technology, particularly when the opportunity for public input is, as a practical matter, too short for any input.

> B. Is the resulting layoff plan void because SEC meetings were not open to the public?

RCW 42.30.060 provides:

*Ordinances, rules, resolutions, regulations, etc., to be adopted at public meetings—Notice.* No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter. *Any action taken at meetings failing to comply with the provisions of this section shall be null and void.*

(Italics mine.)

"Action" was a defined term under former RCW 42.30-.020 (Laws of 1983, ch. 155, § 1, p. 669):

(3) "Action" means the transaction of the official business of a public agency by a governing body including but not limited to a collective decision made by a majority of the members of a governing body, a collective commitment or promise by a majority of the members of a governing body to make a positive or negative decision, or an actual vote by a majority of the members of a governing body when sitting as a body or entity, upon a motion, proposal, resolution, order, or ordinance.

The definition of "action" has been amended by Laws of

1985, ch. 366, § 1, p. 1301.

AGO 33 (1971), at 39 interprets the reference in RCW 42.30.060 to "action taken at meetings failing to comply with the provisions of *this section*" to incorporate by internal reference all of the *notification* and *public meeting* requirements of the act. (Italics mine.)

In 1975, *Mead Sch. Dist. 354 v. Mead Educ. Ass'n,* 85 Wn.2d 140, 530 P.2d 302 (1975) followed AGO 33 (1971). There, the court held the school board's failure to comply with the requirements of notice to members of the public agency and the media 24 hours prior to holding an unscheduled meeting resulted in the resolution passed at the meeting being considered "legally nonexistent." *Mead Sch. Dist. 354,* at 145. Therefore, the lawsuit purportedly authorized by resolution was unauthorized and the lawsuit had to be dismissed. *Mead Sch. Dist. 354,* at 145.

Here, the SEC held seven meetings, not open to the public, to develop a recommended layoff plan. Following completion of the draft plan, it was released to the academic community and discussed at a regular faculty senate meeting on June 2, 1982, and again reviewed and discussed at an open faculty meeting on June 8, with an opportunity for response by noon, June 9. The SEC again met on June 10 with individual department chairpersons, the result being the plan was further modified in closed meetings to delete a physics position from the layoff lists. The university president then implemented the layoff plan.

The definition of "action" then in effect encompasses the recommendation of a layoff plan under the wording, "a collective decision made by a majority of the members of a governing body" and, notably, the definition specifically states action is not limited to the enumerated examples.

The university argues because the university president made the final decision to implement the layoff plan, any violation of the Open Public Meetings Act of 1971 by the SEC is irrelevant since it would not extend to the president's decision.

An individual's decision is not within the Open Public

Meetings Act of 1971. AGO 33 (1971), at 7. However, I have already emphasized that *Cathcart,* at 107, rejected the argument that a decision by a committee which is ultimately reviewed by another decision maker is not covered by the act. The policy is to allow the public a view of the process at all levels. *Cathcart,* at 107. While the university president did not merely "rubber stamp" the SEC's recommended layoff plan, the plan was substantially approved as recommended.

I would hold the recommended layoff plan was formulated in meetings not open to the public, thus it was void.

C. Does Dr. Refai have standing to raise a violation of the Open Public Meetings Act of 1971?

There are two types of meetings defined by RCW 42.30. The notice required for a meeting depends on the classification of the meeting involved. RCW 42.30.075 defines "regular" meetings as those "recurring meetings held in accordance with a periodic schedule declared by statute or rule." Special notice requirements are provided for special meetings in RCW 42.30.080; written notice must be given to each member of the governing body and to each newspaper, radio station or television station which has on file with the governing body a written request to be notified of a special meeting.

In *Kirk v. Pierce Cy. Fire Protec. Dist. 21,* 95 Wn.2d 769, 772, 630 P.2d 930 (1981), the court held a discharged employee did not have standing to raise the matter of improper notice to a board member under the Open Public Meetings Act of 1971 regarding notice of a special meeting of the commissioners of a fire protection district. In *Kirk* no media station had filed a request for notice of special meetings, so only the members of the governing body were entitled to notice. *Kirk,* at 773. The discharged employee was not a member of the governing body, thus he had no standing to raise the issue; however, unlike Dr. Refai, he was present at the meeting considering his dismissal. *Kirk,* at 770.

The university argues *Kirk* precludes Dr. Refai from raising a violation of the Open Public Meetings Act of 1971 because he was not entitled to notice and thus has no standing. Under *Kirk,* Dr. Refai would have no standing to raise a violation of the notice requirements for a special meeting. But it is not clear that under *Kirk* Dr. Refai would have no standing to claim the action of the SEC was void because it was taken at a meeting closed to the public.

RCW 42.30.130 provides:

> Violations—Mandamus or injunction. *Any person* may commence an action either by mandamus or injunction for the purpose of stopping violations or preventing threatened violations of this chapter by members of a governing body.

(Italics mine.) AGO 33 (1971), at 39 n.19 pointed out that the original bill creating the Open Public Meetings Act of 1971 would have limited standing to sue to "any *interested person*". The fact that the broader "any person" language was adopted supports a conclusion that standing is to be more broadly construed.

Dr. Refai claims he is an aggrieved person and is covered by the "any person" language of RCW 42.30.130. I agree. I find no objection that he has chosen to incorporate his request for relief within the appeal process granted him under the faculty code, rather than pursuing a separate action by mandamus or injunction.

In summary, I would hold Dr. Refai has standing to raise a violation of the Open Public Meetings Act of 1971. I would affirm the Superior Court's reversal of the decision of the Board of Trustees and reinstatement of Dr. Refai. The layoff was void because the procedure followed violated the Open Public Meetings Act of 1971.

Reconsideration denied September 24, 1987.

Review denied by Supreme Court February 1, 1988.