Brian CLARK, dba Visions,
Plaintiff–Appellant,

v.

CITY OF LAKEWOOD, Defendant–
Appellee.

No. 99–35453.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 8, 2000

Filed Aug. 6, 2001

As Amended Aug. 15, 2001.

Jack R. Burns, Bellevue, Washington, for the plaintiff-appellant.

Phil Brennan, Dennis J. La Porte, Daniel B. Heid, Krilich, La Porte, West & Lockner, Tacoma, Washington, for the defendant-appellee.

Before: B. FLETCHER and FISHER, Circuit Judges, and SCHWARZER,* District Judge.

---

* The Honorable William W Schwarzer, Senior District Judge, United States District Court for the Northern District of California, sitting by designation.

## OVERVIEW

FISHER, Circuit Judge:

Bryan Clark, the owner of three closed adult businesses in the City of Lakewood, brought this lawsuit challenging Lakewood's new adult cabaret ordinance ("Ordinance"). Clark claims the Ordinance violates the First Amendment of the United States Constitution and the free speech provisions of the Washington Constitution and was passed in violation of the Washington Open Public Meetings Act ("OPMA"). Both Clark and the City of Lakewood moved for summary judgment. The district court granted summary judgment in favor of Lakewood concluding that Clark lacked standing and that the Ordinance was constitutional. We reverse. We hold that Clark has standing to raise most of his claims. We further hold that Lakewood developed its factual findings for the Ordinance in violation of the OPMA, thereby making them "null and void," so that the Ordinance itself may lack evidentiary support and may therefore be unconstitutional. We also conclude that the Ordinance's 21–day waiting period for managers on its face violates the Washington Constitution.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Adult Task Force and Passage of the Ordinance

In May 1996, the Lakewood City Council authorized the Lakewood Planning Advisory Board ("Board") to analyze adult entertainment uses within the city. The Board is a seven-member body that provides recommendations to the City Council on land use issues, development regulations and other control measures. The Board formed a subcommittee, the Lakewood

Adult Entertainment Task Force ("Task Force"), to analyze all aspects of adult entertainment in the city. The Board made five formal appointments to the Task Force: three members and two citizens who were in favor of strict regulation of adult businesses.

The Task Force conducted 10 or 11 meetings, the majority of them closed to the public.[1] According to Michael Bugher, the City of Lakewood's staff member for the Task Force, "task force members preferred that there be occasions when there would not be the public present." While it is unclear what occurred at any specific meeting, the Task Force conducted numerous and diverse tasks. From September 1996 to February 1998, the Task Force toured the adult entertainment businesses in Lakewood, took testimony from Lakewood police officers and members of Washington Together Against Pornography, received business license data on adult businesses, reviewed adult entertainment license fees, examined ownership of adult businesses in Lakewood, surveyed manager and entertainer demographics and met with adult cabaret representatives. The Task Force also reviewed various other cities' adult entertainment regulations, the studies those cities had conducted and federal and state court decisions on the constitutionality of adult entertainment regulation.

With this background, the Task Force drafted a report on the regulation of adult businesses. According to the report itself, it "constitutes the background, findings and conclusions of the Task Force. It represents the basis for which the City may, if it deems it appropriate, amend adult entertainment regulations pertaining to both business and land use operations now or in the future." The Report dis-

cussed the common "secondary effects" associated with adult entertainment—particularly crime, worsened public health and decreased property values—and made various findings and conclusions about those effects in Lakewood. In addition to the report, the Task Force drafted a new adult cabaret ordinance.

The Task Force submitted its report and recommendations to the Planning Advisory Board on March 18, 1998. Soon afterwards, the Lakewood adult entertainment industry submitted to the Board a response to the report. The Board considered these materials and public comments and, on April 15, 1998, recommended to the City Council that it pass a new adult cabaret ordinance. At the same time, the Board forwarded the Task Force's report to the City Council.

On May 18, 1998, the Lakewood City Council held a public meeting to consider adopting the proposed new adult cabaret ordinance. According to Bugher, the only evidence the City Council considered was the Task Force's report and the adult entertainment owners' response to that report. At the meeting, the City Council voted to adopt the new adult cabaret regulations and passed Ordinance 171, now codified in the Lakewood Municipal Code ("LMC") at §§ 5.16.000—5.16.120. (*See* Appendix to this Opinion.)

The Ordinance, among other things, requires: (a) adult cabaret owners, managers and entertainers to obtain city-issued licenses and in some instances wait 21 or 35 days for their applications to be processed before being able to work or operate; (b) license applicants to disclose their home addresses and phone numbers; (c) an eight-foot separation between the stage and patrons; (d) a four-foot separation

---

1. Lakewood's representative stated at his deposition that the Task Force held 10 meetings whereas the preamble to the Ordinance states the Task Force held 11 meetings.

between a patron and an entertainer providing a personalized (i.e. "table" or "lap") dance; (e) a three-foot high continuous railing surrounding the stage; (f) minimum lighting provided in all public areas; (g) cabarets to maintain records of their employees; and (h) cabarets to close from 2:00 a.m. to 11:00 a.m. daily. The Ordinance further prohibits the ownership of multiple adult businesses in the City of Lakewood.

## B. Bryan Clark's Business

At the time the Ordinance was passed, Bryan Clark operated an adult business in Lakewood that included an adult cabaret, an adult bookstore and panorama devices for exhibiting adult motion picture films. "Visions," the adult cabaret portion of the business, offered nude and semi-nude dance entertainment in approximately 2,000 square feet of floor space. In addition, it offered personalized dances to members of the audience willing to pay for them.

After the Ordinance was passed, Clark made several changes to his business to comply with the new regulations. He claims the Ordinance's restrictions had a substantial negative effect upon his business, requiring him to reduce the seating capacity of his cabaret dramatically and reduce the number of entertainers performing at any one time. Clark claims that as a result of the Ordinance, his business began losing money and he was forced to close its doors.

Clark had a license to operate his business for the 1998 calendar year. That license was issued under the old licensing scheme in effect prior to the adoption of Ordinance 171. Under the new Ordinance, Clark's license expired on December 31, 1998 and had to be renewed by January 31, 1999. See LMC § 5.16.060. There is nothing in the record to indicate that Clark has since renewed his license or reapplied for a new license to operate an adult cabaret.[2]

## C. The Lawsuit

Clark filed suit in federal court on June 19, 1998 alleging that the Ordinance violates the United States and Washington Constitutions and the OPMA. He seeks declaratory, injunctive and monetary relief.

Clark moved for partial summary judgment in January 1999. Lakewood answered with a cross-motion for complete summary judgment in February. At the April 2, 1999 summary judgment hearing, the district court stated that the Ordinance was constitutional and that Clark lacked standing to raise some of the issues in his lawsuit. The court did not explain why the Ordinance was constitutional and why Clark lacked standing, but instead stated that it was satisfied with the reasoning of Lakewood's brief in support of its motion. The district court denied plaintiff's motion, granted defendant's motion and entered judgment in favor of Lakewood. Clark filed a timely notice of appeal on April 28, 1999. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo. See *Balint v. Carson City,* 180 F.3d 1047, 1050

---

**2.** On February 28, 1996, the City of Lakewood placed a one-year moratorium upon the filing of any applications for new adult cabaret licenses. On January 21, 1997, the City Council extended the moratorium six months until August 28, 1997. Approximately every six months thereafter, upon the expiration of the moratorium, Lakewood extended the moratorium an additional six months. From our research, it appears Lakewood let the moratorium expire on February 28, 2001, and on February 5, 2001, passed Ordinance 258, which regulates the location of sexually oriented businesses.

(9th Cir.1999) (en banc); *Laborers Health & Welfare Trust v. Westlake Dev.*, 53 F.3d 979, 981 (9th Cir.1995). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, (a) "the district court correctly applied the relevant substantive law" and (b) there are no genuine issues of material fact in dispute. *Id.* We review de novo the question whether a party has standing to bring an action. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir.2000).

## DISCUSSION

Clark levels a broadside attack on the Ordinance on several grounds. First, he argues the Ordinance was passed in violation of the Open Public Meetings Act. Second, he argues the Ordinance violates the United States and Washington Constitutions' guarantees of free speech. He makes a facial overbreadth challenge to the entire Ordinance, claiming Lakewood has not put forth sufficient evidence to justify these regulations and that the burdens they place upon free speech are unwarranted. Specifically, he claims that:

(a) The 35–day and 21–day licensing waiting periods for owners and managers, respectively, is an unconstitutional prior restraint because a decision to issue or deny a license is not made within a brief, specified and reasonably prompt period of time. *See Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1100–01 (9th Cir.1998); *Ino, Ino, Inc. v. City of Bellevue*, 132 Wash.2d 103, 123, 937 P.2d 154 (1997).

(b) The licensing requirement for entertainers is also an unconstitutional prior restraint because there is no stay from a decision upholding a license denial and because there is no right to prompt judicial review and decision. *See Baby Tam*, 154 F.3d at 1100–01.

(c) The forced disclosure of license applicants' home addresses and phone numbers does not further a substantial government interest, in violation of the First Amendment. *See Acorn Investments, Inc. v. City of Seattle*, 887 F.2d 219, 225 (9th Cir.1989); *see also Buckley v. Valeo*, 424 U.S. 1, 64–66, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

(d) There is no justification for requiring stage dancers to be eight feet away from the audience, entertainers to stay four feet from patrons while not on stage, a three-foot high railing surrounding the stage, minimum lighting or that cabarets maintain employee records. *See Alameda Books, Inc. v. City of Los Angeles*, 222 F.3d 719, 724–27 (9th Cir. 2000).

(e) The prohibition on owning or operating multiple businesses is an unconstitutional prior restraint that lacks sufficient justification. *See id.*

■■■ Although there has been some confusion in the past, five members of the Supreme Court have agreed that nude dancing is expressive conduct protected by the First Amendment, albeit only at the "outer ambit" of the Amendment's protection. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Colacurcio v. City of Kent*, 163 F.3d 545, 549 (9th Cir.1998) (stating that at that time there was confusion about the level of First Amendment protection accorded nude dancing). The level of constitutional protection and the type of analysis we apply to nude dancing regulations differs depending upon the type and purpose of the restriction. In all situations, however, the government has the burden of proof to justify burdening freedom of expression. *Alameda Books*, 222 F.3d at 724 n. 6.

■■■ Restrictions upon nude dancing are considered content-neutral because they are aimed at the so-called secondary effects of nude dancing and not at expressive conduct. *Pap's A.M.*, 529 U.S. at 289–92, 120 S.Ct. 1382. "The State's interest in

preventing harmful secondary effects is not related to the suppression of expression. In trying to control the secondary effects of nude dancing, the ordinance seeks to deter crime and the other deleterious effects caused by the presence of such an establishment in the neighborhood." *Id.* at 293, 120 S.Ct. 1382.

■ Regulations upon nude dancing are analyzed as time, place and manner restrictions and do not `violate the First Amendment if they pass the *O'Brien* test. *Id.* at 289, 120 S.Ct. 1382. Under that test, a regulation of nude dancing is sufficiently justified if: (a) there is a substantial government interest; (b) the regulation furthers that government interest; (c) the interest is unrelated to the suppression of free expression; and (d) the restriction is no greater than is essential to the furtherance of the government interest. *Id.* at 296–302, 120 S.Ct. 1382; *see United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).[3]

■ A licensing scheme regulating nude dancing is considered a prior restraint because the enjoyment of protected expression is contingent upon the approval of government officials. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223–24, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Baby Tam*, 154 F.3d at 1100. While prior restraints are not unconstitutional per se, any system of prior restraint comes to the courts bearing a heavy presumption against its constitutional validity. *FW/PBS*, 493 U.S. at 225, 110 S.Ct. 596. Like other regulations upon nude dancing, prior restraints can be imposed only if they are reasonable time, place and manner restrictions. *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir.1999). In addition, an adult entertainment licensing scheme must contain at least two procedural safeguards. *See 4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1113 (9th Cir.1999). First, a decision to issue or deny a license must be made within a brief, specified and reasonably prompt period of time. *Baby Tam*, 154 F.3d at 1101; *see FW/PBS*, 493 U.S. at 226, 110 S.Ct. 596. Second, there must be prompt judicial review in the event a license is denied.[4] *Baby Tam*, 154 F.3d at 1100–01; *see FW/PBS*, 493 U.S. at 226, 110 S.Ct. 596.[5]

**3.** In some of our decisions analyzing the constitutionality of nude dancing regulations, we have applied a variation of the test set forth in *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). *See Alameda Books*, 222 F.3d at 722; *Colacurcio*, 163 F.3d at 551. Under that test, "[m]unicipalities may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions are: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information." *Alameda Books*, 222 F.3d at 722 (quoting *Colacurcio*, 163 F.3d at 551) (alterations in the original). There is no substantive difference between these two tests, and a given result under one necessarily dictates an identical outcome under the other. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 298, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (comparing tests and concluding

they are essentially identical). We will use the *O'Brien* test here because that is the test the Supreme Court has most recently held is applicable. *Pap's A.M.*, 529 U.S. at 289, 120 S.Ct. 1382.

**4.** The Supreme Court has not yet ruled on whether prompt judicial review requires a prompt judicial determination on the merits or only prompt access to court review. *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 121 S.Ct. 743, 746, 148 L.Ed.2d 757 (2001) (stating certiorari granted to resolve this issue but petition dismissed because the case was moot). We have held that there must be a prompt judicial determination. *Baby Tam*, 154 F.3d at 1100–01.

**5.** These two safeguards were first set forth by the Supreme Court in *Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). *Freedman* also set forth a third

Before we can reach the merits of Clark's First Amendment challenges, however, we must resolve several issues. First, is this matter justiciable—that is, does Clark have standing and, even if he does, has the case become moot? Second, was the Ordinance passed in violation of the OPMA such as to render the Ordinance null and void?

## I. STANDING AND MOOTNESS

This case raises questions of both standing and mootness. When Clark filed this lawsuit his adult cabaret business had been closed for approximately one month. At that time, he continued to hold a license to operate an adult cabaret in Lakewood and his stated intention was to return to business if the Ordinance were declared unconstitutional. During the pendency of the lawsuit, Clark's license expired and he did not apply for a new license or renew his old one. All of these circumstances raise the question of whether there is an actual case or controversy that is suitable for adjudication.

■■■ The case or controversy limitation on federal judicial authority found in Article III, § 2 underpins the doctrines of both standing and mootness. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The two inquiries, however, differ in critical respects. *Id.* Standing is determined by the facts that exist at the time the complaint is filed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n. 4, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Mootness inquiries, however, require courts to look to changing circumstances that arise after the complaint is filed:

Standing doctrine functions to ensure, among other things, that the scarce re-

procedural safeguard that required the licensor to bear the burden of going to court and justifying a license denial. *Id.* at 59–60, 85 S.Ct. 734. Justice O'Connor's plurality

sources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often ... for years. To abandon the case at an advanced stage may prove more wasteful than frugal.

*Friends of the Earth*, 528 U.S. at 191–92, 120 S.Ct. 693. We first consider whether Clark had standing to bring this lawsuit at the time he filed his complaint on June 19, 1998.

### A. Standing

■■■ Generally, in order to have standing and satisfy Article III's case or controversy requirement, a plaintiff must show he has suffered an injury in fact, that the injury is traceable to the challenged action of the defendant and that the injury can be redressed by a favorable decision. *Id.* at 180–81, 120 S.Ct. 693; *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. A plaintiff must demonstrate standing for each form of relief he seeks. *Friends of the Earth*, 528 U.S. at 191–92, 120 S.Ct. 693. A determination that a plaintiff has standing to seek damages does not ensure that the plaintiff can also seek injunctive or declaratory relief. *Id.* (citing *Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Additionally, a plaintiff may have standing to challenge some provisions of a law, but not others. *See 4805 Convoy, Inc. v. San Diego*, 183 F.3d 1108, 1112–13 (9th Cir.1999) (holding plaintiff had standing to challenge provisions regarding revocation and suspension of adult entertainment licenses but not the issuance of those licenses). We first address whether Clark has standing to seek various forms of relief. We then consider

opinion in *FW/PBS*, however, dispensed with the requirement in the context of business licensing schemes. *FW/PBS*, 493 U.S. at 229–30, 110 S.Ct. 596 (plurality).

whether Clark has standing to challenge specific provisions of the Ordinance.

### 1. Monetary Relief

■ Clark has standing to seek damages resulting from Lakewood's alleged unconstitutional Ordinance. Clark stated by declaration that in the two weeks prior to the effective date of the Ordinance his business grossed $3,814. In the two weeks after the Ordinance went into effect and he began complying with the new regulations, his business grossed only $1,725. This decrease in gross revenue, according to Clark, directly resulted from complying with the Ordinance's restrictions, causing Visions to operate at a daily loss.

In particular, Clark stated he had to reduce the seating area of his cabaret drastically to comply with the new distance regulations and had to hire additional employees to comply with the regulations limiting the job functions a single employee can undertake (e.g., under the Ordinance, a manager cannot also tend bar). Clark further stated that after the Ordinance went into effect, he had fewer customers and fewer entertainers who were willing to work for him under the new regulations. He attributed this to the decreased satisfaction of his customers who would prefer to have entertainers at a closer proximity than the Ordinance allows and their resulting unwillingness to tip entertainers as generously as before. According to Clark, the combined economic consequences of complying with the Ordinance forced him to close his business. Lakewood has not presented any evidence to dispute these statements and on summary judgment we view the evidence in the light most favorable to the nonmoving party. Therefore, for purposes of this appeal, we accept these statements as true.

■ We conclude that Clark's alleged financial loss is a sufficient *injury in fact,* that loss was *caused* by Lakewood's Ordi-nance and could be *redressed* by the payment of damages. *See Young v. City of Simi Valley,* 216 F.3d 807, 815 (9th Cir. 2000) (holding that economic loss suffered as a result of an adult zoning ordinance is a cognizable injury and is sufficient to satisfy the Article III standing requirement); *see also Clinton v. City of New York,* 524 U.S. 417, 432–33, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ("The Court routinely recognizes ... economic injury resulting from governmental actions ... as sufficient to satisfy the Article III 'injury in fact' requirement."). Although the financial impact of an adult entertainment regulation upon a plaintiff has only limited value in determining whether the regulation actually violates the First Amendment, *see Spokane Arcade, Inc. v. City of Spokane,* 75 F.3d 663, 666 (9th Cir.1996), that impact is relevant and sufficient to satisfy Article III's injury-in-fact requirement and allow a plaintiff to proceed with his constitutional challenge to the regulation. We hold that Clark has standing to seek monetary relief.

### 2. Injunctive and Declaratory Relief

■ "Article III standing requires an injury that is actual or imminent, not conjectural or hypothetical. In the context of injunctive relief, the plaintiff must demonstrate a real or immediate threat of an irreparable injury." *Cole v. Oroville Union High Sch.,* 228 F.3d 1092, 1100 (9th Cir.2000) (internal quotations and citations omitted). If a plaintiff has standing to seek injunctive relief, the plaintiff also has standing to seek a declaratory judgment. *See Nashville, C. & St. L. Ry. v. Wallace,* 288 U.S. 249, 261, 264, 53 S.Ct. 345, 77 L.Ed. 730 (1933) (holding that because the matter would have been justiciable as a request for an injunction, the suit for declaratory judgment was capable of federal adjudication).

Lakewood contends Clark lacks standing to seek prospective injunctive or declaratory relief because his business is closed and he is no longer being injured by the Ordinance. Clark responds that the Ordinance forced him to close his business because it imposed upon him unsustainable losses. Significantly, he states by declaration that if the Ordinance is declared unconstitutional, "it is my intent to reopen my business."

Clark's claim in essence is that at the time of filing this lawsuit, the Ordinance imposed operating restrictions preventing him from operating his business at a profit. Clearly, if the Ordinance had *directly* mandated that Clark close his business, he would have standing to request injunctive relief. The forced closing would be an injury in fact, that injury would have been caused by the Ordinance and an injunction stopping enforcement of the Ordinance would redress Clark's injury by allowing him to reopen. See *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 55, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (stating federal jurisdiction was properly invoked where adult movie theaters requested injunctive relief from an ordinance that directly barred them from doing business in their current locations).

By the same reasoning, the Ordinance's *indirect* forced closing of Clark's business by allegedly rendering it unprofitable is also sufficient to give Clark standing to request an injunction. The claimed inability to operate his business (or continued daily losses if he reopened his business) is an injury in fact, that injury is caused by the Ordinance and an injunction stopping enforcement of the Ordinance would redress Clark's injury by allowing him to reopen his business free from the Ordinance's restrictions.

Clark's claimed injury is neither conjectural nor hypothetical. His prospect of reopening was realistic and credible. When he filed the lawsuit, Clark's business had been closed only about a month. He continued to hold all of the licenses he needed to operate an adult business under the old regime in Lakewood and he unequivocally stated he would go back into business if the Ordinance were enjoined. We hold this is sufficient to establish that Clark's threat of injury from the Ordinance was actual and imminent and that he has standing to request injunctive and declaratory relief.

### 3. Standing to Challenge Specific Provisions of the Ordinance

A plaintiff may have standing to challenge some provisions of a law but not others. See *4805 Convoy*, 183 F.3d at 1112–13. Here, Lakewood argues that Clark lacks standing to challenge the licensing requirements for adult cabaret owners, managers and entertainers because those provisions have not caused injury to Clark.

#### a) Licensing of Adult Cabaret Owners

 Clark challenges the Ordinance's requirement that each owner of a cabaret must be issued a license, LMC § 5.16.040, as an unconstitutional prior restraint. We agree with Lakewood that Clark lacks standing to challenge this provision because he cannot satisfy the injury-in-fact requirement. At the time he filed this lawsuit, Clark already had a license to operate an adult cabaret. Enjoining the new-license provision would therefore have had no effect upon Clark. If Clark was subject to any future threat of injury from Lakewood at that time, that threat would have arisen from the procedure for license *renewals* under LMC § 5.16.060. See *4805 Convoy*, 183 F.3d at 1112 (holding plaintiff lacked standing to challenge adult cabaret licensing requirement where it already held a license, but had standing to challenge renewal provisions); *DLS, Inc. v.*

*City of Chattanooga,* 107 F.3d 403, 413–14 (6th Cir.1997) (same). Clark, however, did not challenge the renewal provisions of the Ordinance as unconstitutional, so we need not address whether he would have had standing had he done so.

Clark correctly argues that his situation is distinguishable from *Convoy* because he has indicated his desire to move to another location and this would require him to seek a new license. There is, however, an additional barrier to Clark's seeking a new license. As Clark stated in his declaration, "There is a moratorium ordinance in effect in the City of Lakewood that prohibits the licensing of new adult uses in the City. But for that ordinance, I would be actively attempting to relocate my business." Clark, however, never challenged the moratorium in this, or as far as we can tell, any lawsuit. If, as Clark himself declares, the moratorium is the reason he did not apply for a new license, then the district court could not redress his alleged injury in this lawsuit. *See Lujan,* 504 U.S. at 561–62, 568–571, 112 S.Ct. 2130. The moratorium is an intervening, unchallenged event that prevented the district court from granting Clark the relief he requested at the time he filed this suit.[6]

### b) *Licensing of Adult Cabaret Managers and Entertainers*

■ Clark also challenges the Ordinance's licensing provisions for adult cabaret managers and entertainers, arguing the provisions are facially overbroad prior restraints. Clark alleges the licensing scheme here is facially unconstitutional because there is no requirement that a decision to issue or deny a license to a manager or entertainer be made within a brief, specified and reasonably prompt period of time, there is no stay from a decision

upholding a license denial and there is no right to prompt judicial review and decision. Lakewood contends that Clark, the only plaintiff in this suit, does not have standing to bring claims based upon the third-party rights of his employees, none of whom has applied for or been denied a license. We disagree.

■ Under well-settled law, there is no doubt an adult cabaret manager or entertainer could facially challenge these regulations whether or not he or she had applied for and been denied a license. "[O]ur cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *see also Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). A licensing scheme, adult or otherwise, can vest "unbridled discretion" in a decisionmaker where the scheme fails to place limits upon when a decisionmaker must make a determination. To an unsuccessful license applicant, the unavoidable delay is tantamount to an effective denial of First Amendment rights. *See FW/PBS,* 493 U.S. at 224–25, 110 S.Ct. 596; *4805 Convoy,* 183 F.3d at 1111; *Baby Tam,* 154 F.3d at 1100.

We conclude the alleged defects in Lakewood's licensing scheme create a risk of delay that could unnecessarily foreclose expressive conduct and arbitrarily deny First Amendment rights. *See FW/PBS,*

---

6. We express no opinion as to whether Clark could amend his complaint or file a new lawsuit challenging the new-license requirement for owners now that his license and the moratorium have expired.

493 U.S. at 226–27, 110 S.Ct. 596. Therefore, these provisions can be facially challenged without having to apply for and be denied a license.

The question, then, is whether Clark as the employer of actual or potential managers and entertainers—without whom he cannot operate his business—should have standing to challenge these provisions on behalf of his employees. The answer to this question invokes not only the Article III requirement of injury in fact, but also the prudential considerations that limit the challenges federal courts are willing to hear. *See Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (discussing prudential consideration that, generally, a plaintiff must assert his own legal rights). Under the overbreadth doctrine, these prudential considerations have weighed in favor of allowing litigants to bring First Amendment challenges on behalf of those whose expression might be impermissibly chilled, so long as the plaintiff also suffers an injury in fact. The Court in *Munson* explained:

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Id.* at 956–57, 104 S.Ct. 2839 (internal quotation omitted); *see also 4805 Convoy*, 183 F.3d at 1112 ("[A] plaintiff may challenge an overly broad statute or regulation by showing that it may inhibit the First Amendment rights of individuals who are not before the court.").

An overbreadth challenge is appropriate here because there is a credible risk the Ordinance could cause self-censorship and chilling of expression. For example, instead of subjecting themselves to the alleged unconstitutional licensing scheme, managers and entertainers might choose to engage in their professions in other cities where their livelihood is not dependent upon the issuance and maintenance of a license. Managers might decide they cannot afford to wait 21 days before they can start working or that they cannot risk losing their job if the city revokes their license. Additionally, employees might be concerned about the Ordinance's requirement that they disclose their home address and phone number. Entertainers might be especially concerned about the risk that cabaret patrons could obtain such personal information and harass the entertainers at their homes, or worse. *See LLEH, Inc. v. Wichita County*, 121 F.Supp.2d 513, 525 (N.D.Tex.2000) (holding requirement that adult entertainment employees must disclose their home address and phone number is unconstitutional); *N.W. Enters., Inc. v. City of Houston*, 27 F.Supp.2d 754, 840–41 (S.D.Tex.1998) (same). For these reasons, there is a risk cabaret employees will engage in self-censorship and avoid participating in protected activity in Lakewood. We hold this is a sufficient basis to relax the prudential standing requirements and allow Clark to bring a facial overbreadth challenge to the licensing of managers and entertainers. *See Munson*, 467 U.S. at 956–57, 104 S.Ct. 2839.

With that said, Clark still must meet the requirements for overbreadth

standing: injury in fact and ability satisfactorily to frame the issues in the case. *4805 Convoy*, 183 F.3d at 1112 (quoting *Munson*, 467 U.S. at 958, 104 S.Ct. 2839); *see Cole*, 228 at 1099. In *Munson*, a professional for-profit fundraiser challenged a Maryland law that restricted charities' ability to use more than 25 percent of the money they raised to pay expenses. *Munson*, 467 U.S. at 950, 104 S.Ct. 2839. The Court held that even though the fundraiser's own First Amendment rights were not at issue, it had standing to bring an overbreadth challenge on behalf of its client charities because it suffered a financial injury from the statute. *Id.* at 958, 104 S.Ct. 2839.

Clark has stated a similar threat of specific future harm. Under the Ordinance, the owner of an adult cabaret cannot operate his business without having licensed employees present at all times. *See* LMC §§ 5.16.040(B), 5.16.050(C)(1). Therefore, if the City of Lakewood fails to license Clark's employees, Clark would be unable to resume his business and engage in expressive activity. As in *Munson*, "the activity sought to be protected is at the heart of [Appellant's] business...." 467 U.S. at 958, 104 S.Ct. 2839. Accordingly, Clark has established a constitutionally sufficient injury in fact.

Clark also satisfies the second overbreadth standing requirement: that he can satisfactorily frame the issues in the case.

Clark has a vested interest in having the Ordinance overturned. If he is successful in his challenge to these provisions, he would be able to resume his once profitable business and might also be able to recover damages and attorney's fees. Additionally, Clark has been an aggressive advocate in this matter so far—in motion practice, discovery and on appeal—and has satisfactorily framed the issues in this case. In sum, Clark meets the standing requirements for bringing an overbreadth challenge to the manager and entertainer licensing provisions of the Ordinance.

### B. Mootness

 Even though Clark had standing to bring this lawsuit when he filed his complaint in June 1998, circumstances have changed since then. We must therefore consider whether this action, or portions of it, are now moot. *See Dittman v. California*, 191 F.3d 1020, 1025 (9th Cir. 1999) (holding we have an independent obligation to address sua sponte whether a case is moot). " '[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " *Pap's A.M.*, 529 U.S. at 287, 120 S.Ct. 1382 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)) (alterations in original).[7]

Clark's license to operate an adult cabaret expired on December 31, 1998, Clark not having sought renewal.[8] If he were to

---

7. The phrases "legally cognizable interest" and "injury in fact" are for all practical purposes synonymous. *See Sargeant v. Dixon*, 130 F.3d 1067, 1069 (D.C.Cir.1997) ("In order to have standing to sue in federal court, Article III of the Constitution of the United States requires that a complainant have suffered an injury in fact, which the Supreme Court has defined as the invasion of a concrete, imminent, and legally cognizable interest."). The phrase "legally cognizable interest" is often used to describe Article III's case or controversy requirements when mootness

is at issue, while the phrase "injury in fact" is often used to discuss these requirements when standing is at issue. *See, e.g., City News & Novelty*, 121 S.Ct. at 747 (describing Article III's requirements in the context of mootness); *Friends of the Earth*, 528 U.S. at 180–85, 120 S.Ct. 693 (describing Article III's requirements in the context of standing).

8. From the expiration of Clark's license until at least February 28, 2001, Clark was not able to apply for a new license because Lakewood

reopen his business as he intends to do, it appears he would have to apply for a new license. *See* LMC § 5.16.060(D). The concern is that because Clark no longer has a license to operate an adult cabaret, his future injuries are now too conjectural or hypothetical to satisfy the injury-in-fact requirement allowing him to pursue injunctive relief.

Although the expiration of Clark's license may make it more difficult for Clark to return to business, we conclude Clark still has a legally cognizable interest in the outcome of this lawsuit sufficient to allow him to seek injunctive relief. Clark's stated intention is to return to business. Assuming Clark would now have to apply for a new license and pay a fee as would any new adult cabaret owner, this added step is not an insurmountable barrier and thus not enough to moot Clark's case. *See Pap's A.M.*, 529 U.S. at 287, 120 S.Ct. 1382 (holding that "[s]imply closing [plaintiff's nude dancing establishment] is not sufficient to render the case moot, however. Pap's is still incorporated under Pennsylvania law, and it could again decide to operate a nude dancing establishment in Erie.").[9]

## II. Open Public Meetings Act ("OPMA")

Clark argues that because the Task Force that provided the evidentiary support for Ordinance 171 conducted its meetings in secret, the Ordinance resulting from the Task Force's work is "null and void," according to the terms of the OPMA. We agree that the OPMA applies to the Task Force and that the Task Force violated the OPMA by closing the majority of its meetings to the public. We conclude, however, that the remedy is not declaring the Ordinance null and void, but declaring the actions the Task Force conducted behind closed doors null and void.

■ The purpose of the OPMA is to ensure that public bodies make decisions openly. *See* RCW § 42.30.010; *Miller v. City of Tacoma*, 138 Wash.2d 318, 979 P.2d 429, 432 (1999) (en banc). As stated in the statute:

> The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.

RCW § 42.30.010. To meet the Act's purpose, courts applying its provisions are to construe it liberally. *See* RCW § 42.30.910 ("The purposes of this chapter are hereby declared remedial and shall be liberally construed."); *Miller*, 979 P.2d at

---

had a moratorium upon the issuance of adult cabaret licenses in effect. *See supra* note 2.

9. The Supreme Court's recent decision in *City News & Novelty* does not contradict this conclusion. City News, an adult bookstore, challenged the denial of its license renewal application. 121 S.Ct. at 746. Two months after the Supreme Court granted certiorari, City News withdrew its renewal application and closed its business because it felt it could not compete with a newly-opened, larger, more modern business. Waukesha argued that because it was undisputed that "City News nei-

ther now pursues *nor currently expresses an intent to pursue a license under Waukesha law* . . . the case has become moot, for City News no longer has a legally cognizable interest in the outcome." *Id.* at 746–47 (internal quotations omitted) (emphasis added). The Court agreed, reasoning that a closed business with no intent to reopen does not maintain a live controversy. *Id.* at 748. Here, Clark's stated intention to return to business if the Ordinance is declared unconstitutional sufficiently distinguishes Clark from the plaintiff in *City News & Novelty*.

433. The driving provision of the Act states:

All meetings of a governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise provided in this chapter.

RCW § 42.30.030.

To determine whether the Ordinance is valid under the OPMA, we must answer three questions: (1) Does the OPMA apply to the Task Force? (2) Did the Task Force violate the OPMA? (3) If the Task Force did violate the OPMA, is the remedy nullification of the Ordinance?

### (1) Does the OPMA apply to the Task Force?

 The requirement for open and public meetings applies only to governing bodies of public agencies. RCW § 42.30.030. We must determine whether the Task Force is a "governing body of a public agency."

"Public agency" is defined under RCW § 42.30.020(1) to mean (in relevant part):

(b) Any county, city, school district, special purpose district, or other municipal corporation or political subdivision of the state of Washington;

(c) Any subagency of a public agency which is created by or pursuant to statute, ordinance, or other legislative act, including but not limited to planning commissions, library or park boards, commissions, and agencies....

"Governing body" is defined by RCW § 42.30.020(2) to mean:

the multimember board, commission, committee, council, or other policy or rule-making body of a public agency, or any committee thereof when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment.

 Clearly, the City of Lakewood itself is a public agency as defined under § 42.30.020(1)(b) and the Planning Advisory Board is a public agency under § 42.30.020(1)(c) because it is a "planning commission." Under these definitions, the Lakewood City Council is a "governing body" of the City of Lakewood, because it is a "council" of the public agency of Lakewood. *See* § 42.30.020(2); *Miller*, 979 P.2d at 432 (applying OPMA to Tacoma's City Council). Under the broad definitions of the Act, the Planning Advisory Board is also a "governing body." The Board takes testimony and public comments on behalf of Lakewood and the City Council, as it did prior to passage of Ordinance 171. *See* § 42.30.020(2).

Based upon these predicates and the statute, we conclude that the Task Force is a "governing body of a public agency." The Task Force was created as a committee of the Planning Advisory Board (a "governing body") and it took testimony and public comments, conducted hearings and acted on behalf of the Board and the City Council (both "public agencies"). This places it squarely within the ambit of RCW § 42.30.020(2).

Lakewood disputes that the Task Force is a governing body, citing to *Refai v. Central Washington University*, 49 Wash. App. 1, 742 P.2d 137 (1987). In *Refai*, the Washington Court of Appeals held that the faculty senate executive committee was not a governing body of Central Washington University. The *Refai* court, however, applied an older, narrower definition of governing bodies which limited governing bodies to those groups that make policy or rules. *Id.* at 144. *Refai* itself states that the faculty senate executive committee would probably have been considered a governing body under the then recently enacted new definition of governing bodies. *See id.* at 145 n. 5. That new definition is

the definition we apply today to conclude that Lakewood's Task Force is a governing body of a public agency.

### 2) Did the Task Force Violate the OPMA?

■ The evidence is undisputed that the Task Force violated the OPMA. The Act requires that all meetings of a governing body shall be open to the public. RCW § 42.30.030. The Task Force conducted at least 10 meetings, the majority of them closed to the public. These closed meetings violated the Act.

### 3) Does the Task Force's Violation of the OPMA Result in the Nullification of the Ordinance?

■ The third question we must answer is what consequences flow from the Task Force's violations of the OPMA. Clark would have us declare the entire Ordinance null and void, whereas Lakewood argues that because the ultimate ratification of the Ordinance was done in compliance with the Act, the Ordinance is valid. We agree that the Task Force's violations of the OPMA do not result in the Ordinance being declared null and void under the OPMA. We conclude, however, that the OPMA requires us to declare the Task Force's "actions" that were conducted in violation of the Act null and void.

RCW § 42.30.060 states that:

No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter. Any action taken at meetings failing to comply with the provisions of this subsection shall be null and void.

"Action" is defined to mean:

the transaction of the official business of a public agency by a governing body including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions. "Final action" means a collective positive or negative decision, or an actual vote by a majority of the members of a governing body when sitting as a body or entity, upon a motion, proposal, resolution, order, or ordinance.

RCW § 42.30.020(3).

■ Under these provisions, any action taken in closed meetings is null and void. *See Org. to Preserve Agric. Lands (OPAL) v. Adams County,* 128 Wash.2d 869, 913 P.2d 793, 802 (1996) (en banc). The statute, however, does not require that subsequent actions taken in compliance with the Act also be held null and void. *Id.*[10] In *OPAL,* two members of the County Commission discussed official business—the issuance of a permit—over the phone and not in an open meeting. Subsequently, the entire County Commission decided to issue the permit. The court held that any action taken on the phone was invalid, but the issuance of the permit was valid because it occurred in a public and open meeting. *Id.*

Here, whereas the majority of the Task Force's meetings leading up the Ordinance's passage were conducted behind closed doors, the City Council's actual pas-

---

**10.** There is a limited exception to this rule. If the decisions made in secret meetings are only formally ratified in a public setting, that formal ratification is null and void. *See Miller,* 979 P.2d at 435. In other words, if a city council met in secret and decided how it would vote and then held a public meeting in which it took a formal vote, that formal vote would be invalid. *See id.* This exception does not apply here because the Task Force did not, and could not, ratify the Ordinance.

sage of the Ordinance occurred at a public meeting on May 18, 1998. Therefore, the Ordinance is not null and void under the OPMA. *Id.* We conclude, however, that any actions taken at the Task Force's meetings that were closed to the public are null and void, thereby potentially undercutting the evidentiary foundation for the Ordinance, as we discuss in the next section below. *Id.* at 883, 913 P.2d 793. Accordingly, we reverse the district court's summary judgment in favor of Lakewood and denial of partial summary judgment in favor of Clark. As this is an appeal from a pretrial order, the record is not fully developed and we are unable to conclude what specific Task Force actions were conducted in open meetings and which were conducted in closed meetings. Upon remand, at trial or through other appropriate means, the district court will have to determine which actions are null and void and what effect, if any, that may have on the constitutionality of the Ordinance's provisions.

### III. First Amendment Challenges

As discussed earlier, a nude dancing regulation must meet the constitutional requirements of the *O'Brien* test. *Pap's A.M.*, 529 U.S. at 289, 120 S.Ct. 1382. We need not determine whether the Ordinance satisfies the first, third or fourth prongs of the *O'Brien* test, for even if it did, there is a material fact in dispute as to the second step in the analysis: whether the Ordinance furthers an important or substantial government interest.

Lakewood argues that the Ordinance furthers several significant government interests—protecting public health and safety and curtailing public sexual conduct and sexual crimes. These interests are indeed significant. *Goehring v. Brophy*, 94 F.3d 1294, 1300 (9th Cir.1996); *BSA, Inc. v. King County*, 804 F.2d 1104, 1111 (9th Cir.1986). The crucial question on which our decision turns, however, is whether

these regulations further those significant interests.

We generally defer to a legislature's judgment on whether regulations advance a government interest. *Alameda Books*, 222 F.3d at 725. Additionally, cities do not necessarily have to conduct their own independent analyses regarding the effects of nude dancing, " 'so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.' " *Pap's A.M.*, 120 S.Ct. at 1395 (quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

In *Alameda Books*, this court struck down the City of Los Angeles' regulations concerning combined adult bookstores and video arcades. The Court concluded that the study the city relied upon to justify its regulations contained no findings regarding the secondary effects of *combined* bookstore/arcades. *Alameda Books*, 222 F.3d at 725. Accordingly, we held it was not reasonable for the city to infer that, in the absence of regulations, a bookstore/arcade combination would have harmful secondary effects. *Id.*

Because the evidence the Lakewood City Council relied upon here may be null and void, there is a genuine issue of material fact regarding whether these regulations further a significant government interest. According to Lakewood's representative, the only evidence the City Council considered in passing the Ordinance was the Task Force's report and the adult entertainment owners' response to that report. The Task Force's report contains the background, findings and conclusions from the Task Force's analyses of the adult entertainment industry in Lakewood. Because the report and its foundation may be partly or entirely null and void under the OPMA, there may have been no valid evidentiary foundation to support the Ordinance's passage. If

so, it is not reasonable to believe the Ordinance is relevant to the problems the city says it is addressing, and Lakewood may not have met its burden to justify its restrictions upon expression. *Id.* Although Lakewood might be able to rely upon other jurisdictions' experiences and studies to demonstrate that secondary effects pose a threat, *see Pap's A.M.*, 529 U.S. at 296–97, 120 S.Ct. 1382, the record indicates the City Council did not do this. Rather it relied solely upon the Task Force's report and comments to that report. Accordingly, we hold there is a genuine issue of material fact in dispute as to whether the Ordinance furthers a significant government interest. We therefore reverse the summary judgment in favor of Lakewood as to the constitutionality of the Ordinance.

## IV. Washington Constitution

 Clark argues that the 21–day waiting period for managers to receive a license violates the Washington constitution because a decision to issue or deny a license is not made within a brief, specified and reasonably prompt period of time. For the sake of judicial economy, we address this claim now because this provision so clearly violates Washington law.[11] *See Ino, Ino, Inc. v. City of Bellevue*, 132 Wash.2d 103, 123, 937 P.2d 154 (1997) (holding 14–day waiting period for managers violated Washington constitution). Lakewood modeled its provision on Bellevue's 14–day waiting period for managers and is nearly identical in every respect— except that the waiting period is even longer. Like Bellevue's law, "[t]he delay in issuing a manager's license suppresses future expression because the City permits nude dancing only if licensed managers are present.. .. Therefore, we hold that the City's failure to provide managers with temporary licenses during the [21]-day delay constitutes a prior restraint in violation of the Washington Constitution."[12] *Id.*

## CONCLUSION

For the foregoing reasons, we REVERSE the summary judgment in favor of Lakewood on all issues except as to Clark's standing to challenge the owner licensing requirement. On that issue we AFFIRM. We REVERSE the denial of summary judgment in favor of Clark as to whether the OPMA applies to the Task Force, whether the Task Force violated the OPMA and whether the 21–day waiting period for managers violates Washington law. Because there are material issues of fact in dispute, we AFFIRM the denial of partial summary judgment in favor of Clark in regard to the constitutionality of the Ordinance. We therefore REMAND for further proceedings consistent with this opinion. Each party to bear its own costs.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

---

**11.** *See AAR Int'l Inc., v. Nimelias Enter. S.A.*, 250 F.3d 510, 523 (7th Cir.2001) (holding appellate courts can address issues whose resolution is "beyond any doubt" in the interest of judicial economy); *cf. Pope v. Man–Data, Inc.*, 209 F.3d 1161, 1164 (9th Cir.2000).

**12.** In holding that this licensing provision offends the Washington Constitution, we do not preclude the possibility that it may also constitute a prior restraint in violation of the federal constitution. *Cf. Baby Tam*, 154 F.3d at 1100–01. However, we look first to state law to resolve this issue, in accordance with our longstanding principle that courts should avoid making federal constitutional decisions unless and until necessary. *See San Remo Hotel v. City and County of San Francisco*, 145 F.3d 1095, 1101 (9th Cir.1998) ("If the constitutional question before us might be mooted or substantially narrowed by decision of the state law claims intertwined with the constitutional issues in this case, then our precedents require abstention in order to avoid an unnecessary conflict between state law and the federal Constitution.").

# APPENDIX

## 05.16.000 - Adult Cabarets

Chapter 5.16
Adult Cabarets

Sections:

| | |
|---|---|
| 5.16.010 | Definitions. |
| 5.16.020 | License required. |
| 5.16.030 | License prohibited to certain classes. |
| 5.16.040 | Application. |
| 5.16.050 | Standards of conduct and operation - Adult cabarets. |
| 5.16.060 | Business License Fees and Renewals. |
| 5.16.070 | Liquor regulations. |
| 5.16.080 | Grounds for Suspension or Revocation, Notice and Order, and Appeal. |
| 5.16.090 | Violation a misdemeanor. |
| 5.16.100 | Nuisance declared. |
| 5.16.110 | Additional enforcement. |
| 5.16.120 | Severability. |

## 05.16.010 - Definitions

A. "Adult cabaret" means any commercial premises, including any cabaret premises, to which any member of the public is invited or admitted and where an entertainer provides live adult entertainment to any member of the public.

B. "Adult entertainment" means:

1. Any exhibition, performance, dance or conduct of any type conducted in a premises where such exhibition, performance, or dance involves a person who is unclothed or in such costume, attire, or clothing as to expose any portion of the female breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals, or wearing any device or covering exposed to view which simulates the appearance of any portion of the female breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals, or human male genitals in a discernibly turgid state, even if completely and opaquely covered; or

2. Any exhibition, performance, dance or conduct of any type conducted in a premises where such exhibition, performance or dance is distinguished or characterized by a predominant emphasis on the depiction, description, simulation or relation to the following specified sexual activities:
 a. Human genitals in a state of sexual stimulation or arousal,
 b. Acts of human masturbation, sexual intercourse or sodomy, or
 c. Fondling or other erotic touching of human genitals, pubic region, buttocks or female breast; or

3. Any exhibition, performance, dance or conduct which is intended to sexually stimulate any member of the public and which is conducted on a regular basis or as a substantial part of the premises activity. This includes, but is not limited to, any such exhibition, performance, dance or conduct performed for, arranged with or engaged in with fewer than all members of the public on the premises at that time, for which payment is made, either directly or indirectly, for such performance, exhibition, dance or conduct and which is commonly referred to as table dancing, couch dancing, taxi dancing, lap dancing, private dancing or straddle dancing, or similar types of performances, exhibitions, dances or conduct.

C. "Applicant" means the individual or entity seeking an adult cabaret license in the City of Lakewood.

D. "Applicant control persons" means all partners, corporate officers and directors and any other individuals in the applicant's business organization who hold a significant interest in the adult cabaret business, based on responsibility for management of the adult cabaret business.

E. "City" means the City of Lakewood..

F. "City Manager" means the City Manager of the City of Lakewood.

G. "City Manager or designee" means either the City Manager of the City of Lakewood or the person designated by the City Manager of the City of Lakewood to handle or perform some act, function, responsibility or task.

H. "Employee" means any and all persons who work in or at or render any services directly related to the operation of any adult cabaret, including, but not limited to managers and entertainers, regardless of whether any such employee is or considers himself or herself an independent contractors or otherwise.

I. "Entertainer" means any person who provides adult entertainment within an adult cabaret as defined in this Section, whether or not a fee is charged or accepted for entertainment.

J. "Liquor" means all beverages defined in RCW 66.04.200.

K. "Manager" means any person who manages, directs, administers or is in charge of the affairs and/or conduct of any portion of any activity involving adult entertainment occurring at any adult cabaret, and includes assistant managers working with or under the direction of a manager to carry out such purposes.

L. "Operator" means any person operating, conducting or maintaining an adult cabaret.

M. "Person" means any individual, partnership, corporation, trust, incorporated or unincorporated association, marital community, joint venture, governmental entity, or other entity or group of persons however organized.

N. "Member of the public" means any customer, patron, club member, or person, other than an employee as defined in this Section, who is invited or admitted to a cabaret.

O. "Sexual conduct" means acts of:
 1. Sexual intercourse within its ordinary meaning, occurring upon any penetration, however slight; or
 2. Any penetration of the vagina or anus, however slight, by an object; or
 3. Any contact between persons involving the sex organs of one person and the mouth or anus or another; or
 4. Masturbation, manual or instrumental, of oneself or of one person by another; or
 5. Touching of the sex organs or anus, whether clothed or unclothed, of oneself or of one person by another; or
 6. Touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party. (Ord. 171 § 1 (part), 1998).

## 05.16.020 - License Required

TITLE 05 BUSIN S LICENSES AND REGULATIONS 05.16 ult Cabarets

A. It is unlawful for any person to conduct, manage or operate an adult cabaret unless such person is the holder of a valid and subsisting license from the City to do so, obtained in the manner provided in this Chapter.

B. It is unlawful for any entertainer, employee or manager to knowingly work in or about, or to knowingly perform any service or entertainment directly related to the operation of an unlicensed adult cabaret.

C. It is unlawful for any entertainer to perform in an adult cabaret unless such person is the holder of a valid and subsisting license from the City to do so.

D. It is unlawful for any manager to work in an adult cabaret unless such person is the holder of a valid and subsisting license from the City to do so. It is also unlawful for any manager to allow or permit an entertainer to perform in an adult cabaret unless such entertainer is the holder of a valid and subsisting license from the City to do so, and it is the responsibility of the manager to make sure that the entertainers who are performing while the manager is working are properly licensed.
(Ord. 171 § 1 (part), 1998).

## 05.16.030 - License Prohibited to Certain Classes

No license shall be issued to:
A. A natural person who has not attained the age of 21 years, except that licenses may be issued to persons who have attained the age of 18 years with respect to cabarets where no intoxicating liquors are served or provided.

B. A person whose place of business is conducted by a manager or agent, unless such manager or agent possesses the same qualifications required of the licensee, or in the case of a manager or an adult cabaret, the manager has obtained a manager's license.

C. A copartnership, unless all the members thereof are qualified to obtain a license as provided in this Chapter. Such license shall be issued to the manager or agent thereof.

D. A corporation, unless all the officers and directors thereof are qualified to obtain a license as provided herein. Such license shall be issued to the manager or agent thereof.

E. A person, copartnership, or corporation that owns, operates or maintains any other adult cabaret, adult entertainment establishment or sexually oriented business, as those terms are generally understood to mean, located within the City of Lakewood. It is provided, however, that this limitation shall not be applied so as to prohibit the renewal of a license for such a business where such person, copartnership, or corporation operates two or more adult cabaret, adult entertainment establishment or sexually oriented business as of the effective date of the Ordinance by which this provision is adopted, PROVIDED that such adult cabarets, adult entertainment establishments or sexually oriented businesses may not be expanded, enlarged or improved in any way, nor modified in any way that increases the amount or level of activity or business at such adult cabaret, adult entertainment establishment or sexually oriented business, unless the adult cabaret, adult entertainment establishment or sexually oriented business is brought into full compliance with the provisions of this Chapter and the Lakewood Municipal Code; provided that this shall not restrict said person, copartnership, or corporation from making necessary repairs.

F. No more than one adult cabaret, adult entertainment establishment or sexually oriented business may be located on any piece of property or any adjacent piece of property owned or leased by the same person, copartnership, or corporation. It is provided, however, that this limitation shall not

# 1020

be applied so as to prohibit the renewal of a license for such businesses where such adult cabarets, adult entertainment establishments or sexually oriented businesses were located on the same or adjacent property on the effective date of the Ordinance by which this provision is adopted, PROVIDED that such adult cabarets, adult entertainment establishments or sexually oriented businesses may not be expanded, enlarged or improved in any way, nor modified in any way that increases the amount or level of activity or business at either or any such adult cabaret, adult entertainment establishment or sexually oriented business, unless the adult cabarets, adult entertainment establishments or sexually oriented businesses is brought into full compliance with the provisions of this Chapter and the Lakewood Municipal Code; provided that this shall not restrict said person, copartnership, or corporation from making necessary repairs.
(Ord. 171 § 1 (part), 1998).

## 05.16.040 - Application

A. Adult Cabaret License.
1. All applications for an adult cabaret license shall be submitted to the City Manager or designee in the name of the person or entity proposing to conduct an adult cabaret on the business premises and shall be signed by such person and certified as true under penalty of perjury. All applications shall be submitted on a form supplied by the City, which shall require the following information:
a. For the applicant and for each applicant control person, provide: Names, any aliases or previous names, date and place of birth, driver's license number, if any, social security number if any, and business, mailing, and residential address, and business telephone number.
b. If a partnership, whether general or limited; and if a corporation, date and place of incorporation, evidence that it is in good standing under the laws of Washington, and name and address of any registered agent for service of process.
c. Whether the applicant or any partner, corporate officer, or director of the applicant holds any other licenses under this Chapter or any license for similar adult entertainment or sexually oriented business, including motion picture theaters and panoramas, from the City or another city, county or state, and if so, the names and addresses of each other licensed business.
d. A summary of the business history of the applicant and applicant control persons in owning or operating the adult entertainment or other sexually oriented businesses, providing names, addresses and dates of operation for such businesses, and whether any business license or adult entertainment license has been revoked or suspended, and the reason therefor.
e. For the applicant and all applicant control persons, any and all criminal convictions or forfeitures within five years immediately preceding the date of the application, other than parking offenses or minor traffic infractions including the dates of conviction, nature of the crime, name and location of court and disposition.
f. For the applicant and all applicant control persons, a description of business, occupation or employment history for the three years immediately preceding the date of the application.
g. Authorization for the City, its agents and employees to seek information to confirm any statements set forth in the application.
h. The location and doing-business-as name of the proposed adult cabaret, including a legal description of the property, street address, and telephone number, together with the name and address of each owner and lessee of the property.
i. Three (3) two-inch by two-inch color photographs each of the applicant and of applicant control persons, taken within six months of the date of application

showing only the full face.

j. A complete set of fingerprints for the applicant and for each applicant control person, by employees of the department providing law enforcement services for the City of Lakewood.

k. A scale drawing or diagram showing the configuration of the premises for the proposed adult cabaret, including a statement of the total floor space occupied by the business, and marked dimensions of the interior of the premises. Performance areas, seating areas, manager's office and stations, restrooms and service areas shall be clearly marked on the drawing. An application for a license for an adult cabaret shall include building plans which demonstrate conformance with Section 5.16.050 of the City Code.

2. An application shall be deemed complete upon the applicant's provision of all information requested above, including identification of "none" where that is the correct response, and the applicant's verification that the application is complete. The City Manager or designee may request other information or clarification in addition to that provided in a complete application where necessary to determine compliance with this Chapter.

3. A non-refundable application fee must be paid at the time of filing an application in order to defray the costs of processing the application.

4. Each applicant shall verify, under penalty of perjury that the information contained in the application is true

5. If any person or entity acquires, subsequent to the issuance of an adult cabaret license, a significant interest based on responsibility for management or operation of the licensed premises or the licensed business, notice of such acquisition shall be provided in writing to the City Manager or designee, no later than 21 calendar days following such acquisition. The notice required shall include the information required for the original adult cabaret license application.

6. The adult cabaret license, if granted, shall state on its face the name of the person or persons to whom it is issued, the expiration date, the name or names under which the business shall be done or by which the business shall be known and the address of the location of the licensed adult cabaret. The permit shall be posted in a conspicuous place at or near the entrance to the adult cabaret so that it can be easily read at any time the business is open.

7. No person granted an adult cabaret license pursuant to this Chapter shall operate the adult cabaret business under a name not specified on the license, nor shall any person operate an adult cabaret under any designation or at any location not specified on the license.

8. Upon receipt of the complete application and fee, the City Manager or designee shall provide copies to the police, fire, and community development departments for their investigation and review to determine compliance of the proposed adult cabaret with the laws and regulations which each department administers. Each department shall, within 30 calendar days of the date of such application, inspect the application and premises and shall make a written report to the City Manager or designee whether such application and premises comply with the laws administered by each department. No license may be issued unless each department reports that the application and premises comply with the relevant laws. In the event the premises is not yet constructed, the departments shall base their recommendation as to premises compliance on their review of the drawings submitted in the application. Any adult cabaret license approved prior to premises construction shall contain a condition that the premises may not open for business until the premises have been inspected and determined to be in substantial conformance with the drawings submitted with the application. A department shall recommend denial of a license under this subsection if it finds that the proposed adult cabaret is not in conformance with the requirements of this Chapter or other law in effect in the City. A recommendation for denial shall cite the specific reason therefor, including applicable laws.

**1022**

9. An adult cabaret license shall be issued by the City Manager or designee within thirty-five (35) calendar days of the date of filing a complete license application and fee, unless the City Manager or designee determines that the applicant has failed to meet any of the requirements of this Chapter or provide any information required under this subsection or that the applicant has made a false, misleading or fraudulent statement of material fact on the application for a license. The City Manager or designee shall grant an extension of time in which to provide all information required for a complete license application upon the request of the applicant. If the City Manager or designee finds that the applicant has failed to meet any of the requirements for issuance of an adult cabaret license, the City Manager or designee shall deny the application in writing and shall cite the specific reasons therefor, including applicable law. If the City Manager or designee fails to issue or deny the license within thirty-five (35) calendar days of the date of filing of a complete application and fee, the applicant shall be permitted, subject to all other applicable law, to operate the business for which the license was sought until notification by the City Manager or designee that the license has been denied, but in no event may the City Manager or designee extend the application review time for more than an additional 20 calendar days.

B. Adult Cabaret Manager and Entertainer Licenses.

 1. No person shall work as a manager, assistant manager or entertainer at an adult cabaret without an entertainer's or manager's license from the City. Each applicant for a manager's or entertainer's license shall complete an application on forms provided by the City containing the information identified below. A nonrefundable application fee of $100.00 shall accompany the application. A copy of the application shall be provided to the police department for its review, investigation and recommendation. All applications for a manager's or entertainer's license shall be signed by the applicant and certified to be true under penalty of perjury. The manager's or entertainer's license application shall require the following information:

 a. The applicant's true name, home address, home telephone number, date and place of birth, fingerprints taken by employees of the department providing law enforcement services for the City of Lakewood, social security number, and any stage names or nicknames used in entertaining.

 b. The name and address of each business at which the applicant intends to work.

 c. Documentation that the applicant has attained the age of 18 years. Any two of the following shall be accepted as documentation of age:

 i. A motor vehicle operator's license issued by any state bearing the applicant's photograph and date of birth;

 ii. A state issued identification card bearing the applicant's photograph and date or birth;

 iii. An official passport issued by the United States of America;

 iv. An immigration card issued by the United States of America; or

 v. Any other identification that the City determines to be acceptable.

 d. A complete statement of all convictions of the applicant for any misdemeanor or felony violations in this or any other city, county, or state within five years immediately preceding the date of the application, except parking violations or minor traffic infractions.

 e. A description of the applicant's principal activities or services to be rendered.

 f. Three (3) two-inch by two-inch color photographs of applicant, taken within six months of the date of application showing only the full face.

 g. Authorization for the City, its agents and employees to investigate and confirm any statements set forth in the application.

 2. The City Manager or designee may request additional information or clarification when necessary to determine compliance with this Chapter.

 3. An adult cabaret manager's or an adult entertainer's license shall be issued by the City Manager or designee within twenty-one (21) calendar days from the date the complete

application and fee are received, or the conditional license issued to an applicant for an adult entertainer's license shall automatically be converted to a permanent license for the year for which the application was submitted, as provided hereinbelow, unless the City Manager or designee determines that the applicant has failed to provide any information required to be supplied according to this Chapter, has made any false, misleading or fraudulent statement of material fact in the application, or has failed to meet any of the requirements for issuance of a license under this Chapter. If the City Manager or designee determines that the applicant has.failed to qualify for the license applied for, the City Manager or designee shall deny the application in writing and shall cite the specific reasons therefor, including applicable laws.

4. If the City Manager or designee has failed to approve or deny an application for an adult cabaret manager's license within twenty-one (21) calendar days of filing of a complete application, the applicant may, subject to all other applicable laws, commence work as an adult cabaret manager in a duly licensed adult cabaret until notified by the City Manager or designee that the license has been denied, but in no event may the City Manager or designee extend the application review time for more than an additional 20 calendar days.

5. Upon receipt of a fully complete license application and fee, an applicant for an adult entertainer's license shall be issued a conditional license. On the twenty-first (21st) day following the filing of the complete application and fee, or the conclusion of the application review time period if extended by the City Manager or designee, said conditional license will automatically convert to a permanent license for the calendar year for which the license application was submitted, unless, after review, the City Manager or designee has denied the license application. Provided that, if the applicant appeals the denial of the license application, the conditional license shall remain valid until the final determination of the appeal from the denial of the application, as indicated by the final determination of such appeal. In no event may the City Manager or designee extend the application review time for more than an additional 20 calendar days.

(Ord. 187 § 1, 1998; Ord. 171 § 1 (part), 1998).

### 05.16.050 - Standards of Conduct and Operation - Adult Cabarets

A. The following standards of conduct must be adhered to by employees of any adult cabaret while in any area in which members of the public are allowed to be present:

1. No employee or entertainer shall be unclothed or in such less than opaque and complete attire, costume or clothing so as to expose to view any portion of the female breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals, except upon a stage at least 18 inches above the immediate floor level and removed at least eight feet from the nearest member of the public.

2. No employee or entertainer mingling with members of the public shall be unclothed or in less than opaque and complete attire, costume or clothing as described in subdivision 1 of this subsection, nor shall any male employee or entertainer at any time appear with his genitals in a discernibly turgid state, even if completely and opaquely covered, or wear or use any device or covering which simulates the same.

3. No employee or entertainer mingling with members of the public shall wear or use any device or covering exposed to view which simulates the breast below the top of the areola, vulva, genitals, anus, any portion of the pubic region, or buttocks.

4. No employee or entertainer shall caress, fondle or erotically touch any member of the public. No employee or entertainer shall encourage or permit any member of the public to caress, fondle or erotically touch any employee or entertainer.

5. No employee or entertainer shall perform actual or simulated acts of sexual conduct as defined in this Chapter, or any act which constitutes a violation of Chapter 7.48A RCW, the Washington Moral Nuisances Statute.

**1024**

6. No employee or entertainer mingling with members of the public shall conduct any dance, performance or exhibition in or about the non-stage area of the adult cabaret unless that dance, performance or exhibition is performed at a distance of no less than four feet from any member of the public.

7. No payment, tip or gratuity may be paid directly to any adult entertainer or other employee of an adult cabaret as compensation for any adult entertainment, regardless of where the adult entertainer or other employee of an adult cabaret is located. Payments made to cashiers, wait-persons or other employees of an adult cabaret for admission fees or for food, beverage or other product sales do not constitute compensation for any adult entertainment. Any payments, tips or gratuities that any patron or other person intends or desires to pay to any adult entertainer or other employee of an adult cabaret as compensation for any adult entertainment shall be deposited in a box or receptacle clearly identified as the box or receptacle into which payments, tips or gratuities shall be received by or deposited for the intended adult entertainer or other employee of an adult cabaret. The location of such box(es) or receptacle(s) shall be in the vicinity of the cash register or counter where payments are made for services provided in the establishment, and shall be clearly visible to the manager of the adult cabaret and to the public. No payment, tip or gratuity may be offered to, or accepted by an adult entertainer in advance of or prior to any performance, exhibition, dance or conduct provided by the entertainer. No entertainer performing upon any stage area shall be permitted to accept any form of payment, tip or gratuity offered directly to the entertainer by any member of the public.

8. No adult cabaret entertainer shall perform any other type of work or service for the adult entertainment establishment by which the entertainer is employed other than that of an adult cabaret entertainer during any twelve (12) hour period from a time that the adult cabaret entertainer has or will work for the adult entertainment establishment as an adult cabaret entertainer. (This provision would prohibit a person from acting as an adult cabaret manager or wait-person or any other position other than adult cabaret entertainer during any twelve hour period following or preceding the time that such person acted in the capacity of an adult cabaret entertainer; and would prohibit a person from acting as an entertainer in the adult cabaret during any twelve hour period following or preceding the time that such person acted or served in the capacity as a wait-person, an adult cabaret manager or any other position other than adult cabaret entertainer at the adult cabaret.

B. At any adult cabaret, the following are required:

1. Admission must be restricted to persons of the age of 18 years or more. It is unlawful for any owner, operator, manager or other person in charge of an adult cabaret to knowingly permit or allow any person under the minimum age specified to be in or upon such premises. The owner, operator, manager or other person in charge of an adult cabaret shall be responsible for checking the identity and age of persons who appear to be close to or under the age of 18 years.

2. Neither the performance nor any photograph, drawing, sketch or other pictorial or graphic representation thereof displaying any portion of the breasts below the top of the areola or any portion of the pubic hair, buttocks, genitals, and/or anus may be visible outside of the adult cabaret. No member of the public shall be permitted at any time to enter into any of the non-public portions of the adult cabaret, which shall include but are not limited to: the dressing rooms of the entertainers or other rooms provided for the benefit of employees, and the kitchen and storage areas; except that persons delivering goods and materials, food and beverages, or performing maintenance or repairs to the premises or equipment on the premises may be permitted into non-public areas to the extent required to perform their job duties.

C. The responsibilities of the manager of an adult cabaret shall include but are not limited to:

1. A licensed manager shall be on duty at an adult cabaret at all times adult entertainment is being provided or members of the public are present on the premises. The name and license of the manager shall be prominently posted during business hours. The manager shall be responsible for verifying that any person who provides adult entertainment within

05-16-8 11-30-98

the premises possesses a current and valid entertainer's license.

2. The licensed manager on duty shall not be an entertainer.

3. The manager or an assistant manager licensed under this Chapter shall maintain visual observation of each member of the public at all times any entertainer is present in the public or performance areas of the adult cabaret. Where there is more than one performance area, or the performance area is of such size or configuration that one manager or assistant manger is unable to visually observe, at all times, each adult entertainer, each employee, and each member of the public, a manager or assistant manager licensed under this Chapter shall be provided for each public or performance area or portion of a public or performance area visually separated from other portions of the adult cabaret.

4. The manager shall be responsible for and shall assure that the actions of members of the public, the adult entertainers and all other employees shall comply with all requirements of this Chapter.

5. Every adult entertainer shall provide his or her license to the adult cabaret manager on duty on the premises prior to his or her performance. The manager shall retain the licenses of the adult entertainers readily available for inspection by the City at any time during business hours of the adult cabaret.

D. Premises - Specifications.

1. Performance Area. The performance area of the adult cabaret where adult entertainment as described in Section 5.16.050(A)(1) is provided shall be a stage or platform at least 18 inches in elevation above the level of the patron seating areas, and shall be separated by a distance of at least eight feet from all areas of the premises to which members of the public have access. A continuous railing at least three feet in height and located at least eight feet from all points of the performance area shall separate the performance area and the patron seating areas. The stage and the entire interior portion of cubicles, rooms or stalls wherein adult entertainment is provided must be visible from the common areas of the premises and at least one manager's station. Visibility shall not be blocked or obstructed by doors, curtains, drapes or any other obstruction whatsoever.

2. Lighting. Sufficient lighting shall be provided and equally distributed throughout the public areas of the premises so that all objects are plainly visible at all times. A minimum lighting level is established requiring that lighting be sufficient so that 8 point size print on white background would be readable at a distance of twenty inches from the eyes of the person so reading, and that level of lighting shall be provided for all areas of the adult cabaret where members of the public are admitted.

3. Visibility to Manager. All activity or entertainment occurring on the premises shall be visible at all times by and from the manager on duty at the time.

4. Visibility from Public Places. No activity or entertainment occurring on the premises shall be visible at any time from any public place, and no entertainer shall be visible from any public place during the hours of his or her employment, or apparent hours of such employment, on the premises.

5. Signs. A sign at least two feet by two feet, with letters at least one inch high shall be conspicuously displayed in the public area(s) of the premises stating the following:

THIS ADULT CABARET IS REGULATED BY THE CITY OF LAKEWOOD. ENTERTAINERS ARE: (A) NOT PERMITTED TO ENGAGE IN ANY TYPE OF SEXUAL CONDUCT; (B) NOT PERMITTED TO APPEAR SEMI-NUDE OR NUDE, EXCEPT ON STAGE; (C) NOT PERMITTED TO ACCEPT PAYMENTS, TIPS OR GRATUITIES IN ADVANCE OF THEIR PERFORMANCE; (D) NOT PERMITTED TO ACCEPT PAYMENTS, TIPS OR GRATUITIES DIRECTLY FROM PATRONS

6. Business Signs. Exterior signs and any interior sign or notice visible to the public may announce the name of the business and the nature of the business by the terms "adult

**1026**

entertainment", "adult theater" or "adult use establishment" but shall not contain any representation of the human body or make any statement pertaining to the human body, whether of entertainers, patrons or the public.

7. Price List. There shall be posted and conspicuously displayed in all areas of the adult cabaret where members of the public are admitted a list of any and all types of entertainment, performances, dances or conduct or other services provided on the premises for which a fee or charge is or may be paid. Such list shall further indicate the specific fee or charge in dollar amounts for each entertainment listed. It shall be unlawful for any entertainer, manager or other person to charge, request or demand any fee or charge in excess of the amount so posted. All payments for such entertainment, performances, dances or conduct or other services shall be paid in accordance with this Section.

8. Record Keeping Requirements.
 a. All papers, records, and things required to be kept pursuant to this Chapter shall be open to inspection by the City Manager or designee during the hours when the licensed premises are open for business, upon two working days' written notice. The purpose of such inspections shall be to determine whether the papers, records, and things meet the requirements of this Chapter.
 b. Each adult entertainment business shall maintain and retain for a period of two years the name, address, and age of each person employed or otherwise retained or allowed to perform on the premises as an adult entertainer, including independent contractors and their employees, as an entertainer. This information shall be open to inspection by the clerk during hours of operation of the business upon 24 hours' notice to the licensee.

9. Inspections. In order to insure compliance with this Chapter all areas of licensed adult cabarets which are open to members of the public shall be open to inspection by agents and employees of the City during the hours when the premises are open for business. The purpose of such inspections shall be to determine if the licensed premises are operated in accordance with the requirements of this Chapter. It is hereby expressly declared that unannounced inspections are necessary to insure compliance with this Chapter.

E. It is unlawful for any adult cabaret to be operated or otherwise open to the public between the hours of 2:00 a.m. and 11:00 a.m.

F. This Chapter shall not be construed to prohibit:
 1. Plays, operas, musicals, or other dramatic works that are not obscene;
 2. Classes, seminars and lectures which are held for serious scientific or educational purposes and which are not obscene; or
 3. Exhibitions, performances, expressions or dances that are not obscene.
 These exemptions shall not apply to the sexual conduct defined in Section 5.16.010 (O) of the City Code, or the sexual conduct described in RCW 7.48A.010 (2)(b)(ii) and (iii).

G. Whether or not activity is obscene shall be judged by consideration of the following factors:
 1. Whether the average person, applying contemporary community standards, would find that the activity taken as a whole appeals to a prurient interest in sex; and
 2. Whether the activity depicts or describes in a patently offensive way, as measured against community standards, sexual conduct as described in RCW 7.48A.010 (2)(b); and
 3. Whether the activity taken as a whole lacks serious literary, artistic, political or scientific value.

(Ord. 183 § 1,2, 1998; Ord. 178 § 1, 1998; Ord. 171 § 1 (part), 1998).

## 05.16.060 - Business License Fees and Renewals

A. Annual License Fees. Annual license fees shall be as follows:

| Adult Entertainment | $750.00 per year |
|---|---|
| Manager/Entertainer | $100.00 per year |

There shall be no proration of license fees, and all licenses issued pursuant to this Chapter shall expire at 12:00 p.m. (midnight) on December 31 of the year issued.

B. Renewal of License. All business licenses shall be renewed on or before January 31st of the tax year following the year of issuance or renewal of the current license, if the business is to be continued. Application for renewal shall be made on forms prescribed by the City Manager, or designee. Each application for renewal shall be accompanied by the license renewal fee for the ensuing tax year as prescribed by an annual resolution of the City Council establishing fees and charges. Applications for renewal shall be processed hereafter by the City commencing during December of each tax year for the ensuing tax year. Although the City shall endeavor to mail renewal notices for the next year to persons who possess valid licenses at the end of the current year, it shall be the responsibility of the applicant to submit to the City the appropriate applications and fees for license renewal, regardless of whether or not renewal notices are sent out or received.

C Late penalty. A late penalty shall be charged on all applications for renewal of a license received later than seven working days after the due date (January 31st) of such license. The amount of such penalty is fixed as follows:

| Days Past Due | Additional Percentage of License Fees |
|---|---|
| 1-30 | 25% |
| 31-60 | 50% |
| 61 and over | 100% |

D. Cancellation of Delinquent License. Notwithstanding the provisions of subsection C above, if an application for the renewal of an adult cabaret business license is received by the City more than ninety (90) calendar days past the due date, the business license (renewal) application shall be considered a new license application, with any rights, privileges or expectations related to a license renewal being canceled, so that all applicable code requirements and regulations must be met as if the business had not operated in the past. It is provided, however, that if a license application is approved after having been canceled because of more than ninety (90) calendar days delinquency, the additional percentage of license fee (100%) shall be paid prior to issuance of the license.

(Ord. 171 § 1 (part), 1998).

## 05.16.070 - Liquor Regulations

Any license issued pursuant to this Chapter for any business in which any liquor is consumed shall be subject to the rules or regulations of the Washington State Liquor Control Board relating to the sale or use of intoxicating liquor, regardless of whether the liquor is provided pursuant to a liquor license or banquet permits. No liquor shall be allowed in any adult cabaret establishment without either a valid liquor license or banquet permit issued by or under the authority of the Washington State Liquor Control Board. In the event of a conflict between the provisions of this Chapter and the applicable rules and regulations of the Washington State Liquor Control Board, the rules and regulations of the Washington State Liquor Control Board shall control.

(Ord. 171 § 1 (part), 1998).

## 05.16.080 - Grounds for Suspension or Revocation, Notice and Order and Appeal

**1028**

A. General Business Licensing Provisions Referenced. The provisions of Sections 5.02.170, 5.02.180 and 5.02.190 of the City Code shall apply to licensing issues under this Chapter to the extent that the provisions of Sections 5.02.170, 5.02.180 and 5.02.190 of the City Code are not in specific conflict with the provisions hereof, and said provisions are thus incorporated herein by this reference as if fully set forth.

B. Appeal to Superior Court. Notwithstanding the provisions of Section 1.36.090 of the City Code, any appeals or requests for review by persons aggrieved by the decision of the Hearing Examiner related to a license or a provision under this Chapter shall be made to the Superior Court, whether as an appeal or a writ of certiorari, prohibition or mandamus.

(Ord. 171 § 1 (part), 1998).

### 05.16.090 - Violation a Misdemeanor

Any person violating any of the provisions of this chapter is guilty of a misdemeanor.
(Ord. 171 § 1 (part), 1998).

### 05.16.100 - Nuisance Declared

A. Public Nuisance. Any adult cabaret operated, conducted, or maintained in violation of this chapter or any law of the City of Lakewood or the State of Washington shall be, and the same is, declared to be unlawful and a public nuisance. The City Attorney may, in addition to or in lieu of any other remedies set forth in this chapter, commence an action to enjoin, remove or abate such nuisance in the manner provided by law and shall take such other steps and apply to such court or courts as may have jurisdiction to grant such relief as will abate or remove such public nuisance, and restrain and enjoin any person from operating, conducting or maintaining an adult cabaret contrary to the provisions of this chapter.

B. Moral Nuisance. Any adult cabaret operated, conducted or maintained contrary to the provisions of Chapter 7.48A RCW , Moral Nuisance, shall be, and the same is declared to be, unlawful and a public and moral nuisance and the City Attorney may, in addition to or in lieu of any other remedies set forth herein, commence an action or actions, to abate, remove and enjoin such public and moral nuisance, or impose a civil penalty, in the manner provided by Chapter 7.48A RCW.

(Ord. 171 § 1 (part), 1998).

### 05.16.110 - Additional Enforcement

The remedies found in this chapter are not exclusive, and, the City may seek any other legal or equitable relief, including but not limited to enjoining any acts or practices which constitute or will constitute a violation of any business license ordinance or other regulations herein adopted.
(Ord. 171 § 1 (part), 1998).

### 05.16.120 - Severability

If any portion of this chapter, or its application to any person or circumstances, is held invalid, the validity of the chapter as a whole, or any other portion thereof, and its application to other persons or circumstances, shall not be affected.
(Ord. 171 § 1 (part), 1998).